## In re CARTER.

### No. 10504.

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 9, 1950.

Decided Jan. 18, 1951.

On Rehearing in Banc July 20, 1951.

James A. Cobb and George E. C. Hayes, Washington, D. C., with whom Howard Jenkins, Jr., Washington, D. C., was on the brief, for appellant.

Oscar H. Davis, Special Asst. to the Atty. Gen., for the Solicitor General of the United States as amicus curiæ.

Philip B. Perlman, Sol. Gen. of United States, Washington, D. C., as amicus curiæ, urged affirmance.

Before EDGERTON, CLARK, and PRETTYMAN, Circuit Judges.

EDGERTON, Circuit Judge.

An Act of Congress declares that "The business of becoming surety for compensation upon bonds in criminal cases in the District of Columbia is impressed with a public interest." D.C.Code (1940) § 23-602. It requires the District Court and other trial courts "to provide, under reasonable rules and regulations, the qualifications of persons and corporations applying for authority to engage" in this business, and provides that no one shall engage in it "in any such court until he shall by order of the court be authorized to do so. Such courts, in making such rules and regulations, and in granting authority to persons to engage in the bonding business, shall take into consideration both the financial responsibility and the moral qualities of the person so applying, and no person shall be permitted to engage, either as principal or agent, in the business of becoming surety upon bonds for compensation in criminal cases, who has ever been convicted of any offense involving moral turpitude, or who is not known to be a person of good moral character. * * *" D.C.Code (1940) § 23-608.

In 1947 the District Court licensed appellant Carter to engage in the bonding business for two years. It revoked his license in 1948, after learning that in applying for it he had sworn that he had "never been charged and/or convicted of any offense involving moral turpitude" whereas actually, many years before, he had been charged once with receiving stolen property and three times with violations of the gambling laws. He had never been convicted, or even brought to trial, and under the court's rules about license applications the fact that he had been charged was immaterial. Applicants were required to state whether they had been convicted, but not whether they had been charged. Appellant did not misrepresent any fact about which he was asked. Moreover, he did not intentionally misrepresent any fact whatever. As the District Court found, such misrepresentation as he made "was not made willfully or with a purpose to deceive the Court, but was made on the advice of counsel who informed the petitioner that the language used would not constitute a misrepresentation." The court revoked appellant's license despite these favorable findings, and regarded his application as pending. It obtained a report from the F.B.I. which is not before us. The court did not put the report in the record or even disclose its contents to

counsel but "placed it in a sealed envelope, not to be opened." Six months later the court denied appellant's application. On appeal we held the revocation invalid for lack of "a hearing and revelation of all data upon which a decision is to be based." We held that whatever might be true of the grant of the right to engage in the bonding business, "the deprivation of that right, once granted, is a judicial act, requiring due process of law." [1]

When appellant's license expired he applied for its renewal. His application was verified and was supported by affidavits of good moral character. It conformed to all the rules and regulations of the District Court. The record before that court showed without dispute that the appellant has the qualifications for a bondsman. Yet the District Court denied his application "on the ground that in the opinion of the Court he lacks the qualifications for a bondsman." The present appeal is from that order.

The District Court did not disclose what qualification it believed appellant lacked. Against the background of the sealed envelope its present action seems, as its former action seemed, to imply a belief that appellant's character is not good. It did not disclose the source of its belief. It said appellant's application was "in the administrative discretion of the Court." From that premise it seems to have drawn the conclusion that it could deny the application without a hearing, without evidence, and without possibility of review to determine whether its discretion was abused. On this appeal the Solicitor General as *amicus curiæ* takes substantially the same position. Though some of the language in our opinion on the former appeal may seem to support this position, we think it erroneous.

In re Summers, 325 U.S. 561, 65 S.Ct. 1307, 89 L.Ed. 1795, involved an order of the Supreme Court of Illinois which had denied the application of Summers for admission to the practice of law. The Illinois court regarded its order as "ministerial", like the appointment of a clerk or bailiff, but the Supreme Court of the United States held it "a judgment in a judicial proceeding", 325 U.S. at page 566, 65 S.Ct. at page 1310, and subject to review on certiorari. The Supreme Court said: "A claim of a present right to admission to the bar of a state and a denial of that right is a controversy. When * * * denial of the right is made by judicial order, it is a case which may be reviewed * * *." 325 U.S. at page 568–569, 65 S. Ct. at page 1312.[2]

In Carver v. Clephane we affirmed an order of the District Court dismissing a complaint for admission to the bar. We pointed out that the order was entered "after a hearing".[3] It was based on a finding against the applicant's character. The record supported the finding.

Despite the differences between a lawyer's profession and a bondsman's business, they are alike in all the respects that seem even remotely or possibly pertinent to the question whether a court's order denying a license is judicial. Both differ from some occupations in that they plainly require good moral character, and from most occupations in that they are carried on in connection with courts and require licenses from courts. But both lawyers and bondsmen are on quite a different footing from a court's clerk or bailiff. They are not completely under a court's control, or obligated to deal with the public impartially; within wide limits they may choose how, when, where and whom they will serve. They are not commonly paid from public funds, their callings are not necessarily limited to a single person or to a few persons, and they cannot be deprived of their functions in a court's dis-

1. In re Carter, 85 U.S.App.D.C. 229, 177 F.2d 75, 78; certiorari denied, Laws v. Carter, 338 U.S. 900, 70 S.Ct. 250.

2. The Illinois court had denied Summers' application for admission to practice because he was unwilling to perform military service. A majority of the Supreme Court, four Justices dissenting, concluded this was not a denial of due process of law. There was no dissent from the decision that the Illinois court's order was judicial and reviewable.

3. Carver v. Clephane, 78 U.S.App.D.C. 91, 137 F.2d 685.

cretion. Since a court's order denying an application to practice law is a judicial act, as the Supreme Court determined in the Summers case, so is a court's order denying an application to do business as a bondsman. Since the District Court's order is judicial it is (1) appealable[4] and (2) erroneous because not based "upon a proceeding which contains the elements of due process of law, i. e., a hearing and relevation of all data upon which a decision is to be based."[5] Old charges never brought to trial, and appellant's innocent mistake of fact on an immaterial matter, do not support the order. Neither do any secret charges that may have been made by anonymous informants whom the appellant has had no opportunity to confront and cross-examine.

The idea that this decision means courts must grade examination papers is erroneous. Expert opinion properly before a court on a technical question, such as the extent of an applicant's professional ability as shown by an examination, is of course a proper basis for either judicial or administrative action. A court is under no more obligation to form a judgment independently of expert opinion about an applicant's knowledge of law than about his knowledge of medicine or pharmacy. But no qualification of a bondsman appears to turn on technical questions requiring expert opinion. Certainly character does not. And the record contains no opinion unfavorable to the appellant except the District Court's own.

We do not imply that in our opinion the appealed order would be valid if it were administrative. Like the order involved in Carter's previous appeal, if it were upheld it would destroy an established business. We do not imply that in our opinion a purely administrative refusal to renew, or to grant, a license to do a lawful business could be supported if based on arbitrary grounds[6] or made without such a "hearing and opportunity to answer * * * as would constitute due process."[7]

Reversed.

PRETTYMAN, Circuit Judge (dissenting).

On the first appeal in this case we held, I thought, that the original grant and the renewals of authority to write bail bonds for pay were functions of the District Court with which this court had no concern; except, of course, in the unlikely event of arbitrary abuse. This court held a due process hearing to be necessary to a mid-term revocation of authority, upon the premise that revocation is wholly different from an original grant or a renewal. And I did not understand that phase of the opinion to be entirely *obiter*; it was the premise upon which the decision was founded. The premise was assumed, to be sure, rather than asserted, but that is the way I understood it. However, whether we held it definitively then or not, that view of original grant and of renewal is correct, in my opinion.

Perhaps I had better first describe the difference between us, as I see it, and then state the reasons which appeal to me as controlling. One view is that the rejection of an application of the type here involved is the sort of action which must be based upon an evaluation of evidence openly presented, at a hearing, and subjected to the usual protective measures, such as cross examination, customarily associated with an ordinary due process proceeding. Such an action by the District Court would be reviewable upon the record made. The other view is that the disposition of this type of application is the

---

4. "The courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States * * *." 62 Stat. 929, 28 U.S. C.A. § 1291.

5. In re Carter, supra note 1.

6. Yick Wo v. Hopkins, 118 U.S. 356, 6 S. Ct. 1064, 30 L.Ed. 220; Gundling v. City of Chicago, 177 U.S. 183, 20 S.Ct. 633, 44 L.Ed. 725; Douglas v. Noble, 261 U. S. 165, 43 S.Ct. 303, 67 L.Ed. 590.

7. Goldsmith v. U. S. Board of Tax Appeals, 270 U.S. 117, 123, 46 S.Ct. 215, 217, 70 L.Ed. 494. Cf. Bratton v. Chandler, 260 U.S. 110, 43 S.Ct. 43, 67 L.Ed. 157; Smith v. Foster, D.C.S.D.N. Y., 15 F.2d 115.

exercise of discretionary power, that a burden is upon an applicant to establish his qualifications, and that if he fails to persuade the court in that respect he may be rejected whether any adverse evidence is presented or not; that by well-nigh universal custom courts have utilized confidential methods for determining the qualifications of such applicants, such methods including committees of members of the bar, undisclosed markings on examinations, confidential inquiries as to character, credit reports based upon undisclosed data, and the like. Such a proceeding in the District Court would be reviewable only for abuse of discretion or upon a rejection for prohibited reasons, such as religion or race, apart from qualifications; and the burdens of both allegation and proof would be upon the applicant in such a review proceeding. The former view is that taken by the court, as I understand it. The latter view is the one I take.

Perhaps I had better state also at the beginning what the record shows as to events in the District Court. Carter filed an application for authority to write bail bonds for pay. In the application, which was under oath, he said that he had never been "charged and/or convicted" of a crime. The authority was granted. Some time later information came to the judge that twenty years before that time Carter had been charged three times with violating the laws against gambling and seven years later with receiving stolen property. An informal hearing was held in chambers. The judge said that he thought Carter should have made a frank disclosure, and he issued a rule to show cause why the authority should not be revoked. Answer was made and a formal hearing held in open court. It was shown that no trials had been had on any of the criminal charges, all having been dismissed. The court vacated its original grant of authority and ordered an investigation. At the same time it announced that it would receive evidence upon the charges and also upon the law-abiding life of the applicant —"if he has disassociated himself with any criminal activities, if there were any." Twenty-six letters from prominent persons were thereafter filed on behalf of Carter. An investigation was made, at the request of the court, by the Federal Bureau of Investigation and the United States Attorney's Office, but the results of that investigation were not revealed except to the court. The court denied the application. This court reversed that order. Upon the expiration of the original term, Carter applied to the District Court for a renewal of his authority, filing two affidavits as to his qualifications. The court denied the application for renewal "on the ground that in the opinion of the Court he lacks the qualifications for a bondsman." That order is now here upon appeal.

The writing of bail bonds for pay is not an ordinary vocation the right to pursue which is a basic right and as to which the police power of the state is sharply limited.[1] In the first place, the admission to bail is part of the operation of the trial courts. It is the placing of an accused in the custody of persons selected by him who become, so to speak, his friendly jailers.[2] It is the substitution of one custodian for another. The surety upon the bail has power to arrest the accused.[3] The granting of bail is governed by the Federal Rules of Criminal Procedure.[4] It is performed by a commissioner, judge or justice.[5] Thus

---

1. See 2 Cooley, Constitutional Limitations, c. XVI, p. 1313 et seq. (8th ed. 1927); Note, Necessity of Notice and Hearing in the Revocation of Occupational Licenses, 4 Wis.L.Rev. 180 (1927); Note, Administrative Law—Procedural Due Process in Occupational License Cases—Revocation of License, 20 Neb.L.Rev. 24, 33 (1941); Graves, Professional and Occupational Restrictions, 13 Temp.L. Q. 334 (1939).

2. United States v. Lee, S.D.Ohio, 1909, 170 F. 613; State v. Sandy, 1908, 138 Iowa 580, 116 N.W. 599; Mitchell v. City of Dothan, 1946, 33 Ala.App. 19, 30 So.2d 735.

3. 62 Stat. 821 (1948), 18 U.S.C.A. § 3142.

4. Rules 5(b) and 46, 18 U.S.C.A.

5. Fed.R.Crim.P., 5(b) and 46; 62 Stat. 821 (1948), 18 U.S.C.A. § 3141.

going bail is not an ordinary and independent vocation but is an integral part of the operation of the judicial system. In the second place, the bail bond is a contract with the Government.[6] According to the doctrine of Perkins v. Lukens Steel Co.,[7] no person has a "right" to do business with the Government by contract. That doctrine is peculiarly applicable to bail contracts, because, from the very nature of the transaction, the qualification of a surety to appear upon even one bond is in large measure within judicial discretion. The Rule[8] says that the amount of the bond shall be such "as in the judgment of" the court or commissioner will insure the presence of the accused. And it also says that every individual surety "shall justify by affidavit and may be required to describe in the affidavit the property by which he proposes to justify", etc.[9] Then the Rule says, "No bond shall be approved unless the surety thereon appears to be qualified."[10] That means that a surety must "appear" to the court to be qualified. Surely all those provisions call for discretionary action by the court.

Under the statute generally applicable to bonds furnished the Federal Government, the Secretary of the Treasury is given power to "grant authority" to a bonding company to do business writing bonds.[11] Nevertheless, a court required to accept a bond must approve it,[12] and a District Court can refuse to accept a bond executed by a company in which the court has lost confidence.[13] The inquiry as to the solvency of a surety on a bail bond is a judicial act.[14]

All the foregoing characteristics of bail bonds combine to indicate that there is no basic "right" to enter into them, as surety, with the Government. Due process of law applies to a deprivation only. If a person is not engaged in a business and has no enforceable right to enter upon it, he is not deprived of a right if he is denied the privilege. Since there is no right to write bail bonds for pay, my view is that the customary elements of due process of law are not required for valid denial of the privilege.

This brings us to the statute involved.[15] The business of writing bail bonds for pay gives rise to many practical problems in the administration of criminal justice. There is a great need for available bondsmen in a metropolitan area, where arrests are numerous and the location, qualification, etc., of separate private bondsmen in each case would be prohibitively cumbersome. There are many reputable men and firms in the business. But when this business is without regulation or supervision common report has it that the criminal elements move in and bail bondsmen become an essential of big-time criminal operation. At any rate, the committees of Congress thought some such possibilities required the enactment of the bail bond statute of 1933. They said in their reports:[16]

"Specifically, the intent of the proposed legislation is to give the courts of the District of Columbia power to weed out undesirable persons engaged in the business of executing criminal bonds; to punish unethical collusion between bondsmen, attorneys, and the police; and, in general, to promulgate such rules and regulations as shall be conducive to protecting the public and the courts against unscrupulous bondsmen.

6. La Grotta v. United States, 8 Cir., 1935, 77 F.2d 673, 103 A.L.R. 527, and cases there cited, certiorari denied sub nom. Quigley v. United States, 1935, 296 U. S. 629, 56 S.Ct. 152, 80 L.Ed. 447.

7. 1940, 310 U.S. 113, 60 S.Ct. 869, 84 L. Ed. 1108.

8. Fed.R.Crim.P., 46(c).

9. Id., 46(e).

10. Ibid.

11. 61 Stat. 646 (1947), 6 U.S.C.A. § 8.

12. 61 Stat. 646 (1947), 6 U.S.C.A. § 6.

13. Concord Casualty & Surety Co. v. United States, 2 Cir., 1934, 69 F.2d 78, 91 A.L.R. 885.

14. Hodgkinson v. United States, 5 Cir., 1925, 5 F.2d 628, certiorari denied, 1925, 269 U.S. 554, 46 S.Ct. 18, 70 L.Ed. 408.

15. 47 Stat. 1484 (1933), D.C.Code § 23–608 (1940).

16. Both reports contained the same statement. Sen.Rep.No.832, 72d Cong., 1st Sess. (1932); H.R.Rep.No.2171, 72d Cong., 2d Sess. (1933).

"Under existing conditions, bondsmen conduct their business with virtually no restraint by the courts and are responsible for their conduct to no responsible public official. Abuses of the latitude enjoyed by bondsmen have led to public recognition of the need for legislation."

A reading of the full statute demonstrates its purpose. There are twelve sections, and they deal with relationships between bondsmen and lawyers, police, etc., public listing of bondsmen, their conduct, etc. Every grand jury is required to investigate the manner in which that statute is being enforced.

Congress left to the trial courts the making of rules and regulations under the statute, but it required that the authority to write bonds be renewed from time to time at such periods as the courts might require. Why did Congress do that? Why not grant the authority during good behavior, subject to revocation for cause? Neither the reports of the congressional committees nor the congressional debates contain comment on this feature, but the purpose of the provision seems plain upon its face.

There is a classic difference between limited and unlimited terms; appointment for life and appointment for a term of years; a lease for a year and a life estate; a contract for perpetual service and a contract for a year's service, renewable. There are advantages in each type, probably nowhere better explored than by Hamilton in his Federalist discussions of the various terms of federal offices. The great advantage of a limited term is the necessity for constant maintenance of the standard of qualification which justified the original appointment, or election, or contract. With a limited term only, the contractor must continue the efficiency and the quality which secured for him the initial contract. Moreover, from the standpoint of the grantor or selector, a limited term requires that he give constant attention to the performance and the results; he cannot make his grant and forthwith forget it. Those are obviously the reasons which impelled Congress to prescribe that the authority to write bail bonds in this jurisdiction be for a limited term only. Congress meant to require bondsmen to maintain the qualifications essential to secure the authority in the first place, and it meant to require the courts to keep the matter in periodic reexamination and so in constant attention.

In the present opinion this court says that in all respects even remotely or possibly pertinent authority to write bail bonds is like admission to the bar. I do not think so, for reasons to be related in a moment, but first let us examine applications for admission to the bar. The District Court has for many years had a rule that "No applicant shall be admitted [to practice law] until the said committee [Committee on Admissions and Grievances, composed of members of the bar] shall have caused an exhaustive examination to be made either by the committee or by an appropriate agency as to his character and a favorable report made thereon."[17] So that court refuses to admit without a favorable report from its committee of the bar. The considerations which control that committee are its own business, as its published rules conclusively demonstrate.

The rule in our court is:

"Citizens of the United States or of an Insular Possession thereof who are attorneys in good standing in the Supreme Court of the United States, or in the United States District Court for the District of Columbia, or who for three years past have been attorneys or counsellors in good standing in the highest court of a State, Territory, or Insular Possession of the United States, and whose private and professional characters appear to be good, may in the discretion of this court be admitted to practice."[18]

Thus, so far as we ourselves in this court are concerned, even if an applicant is an attorney in good standing in the Supreme Court of the United States, and even if his private and professional character appears to be good, his admission is a matter of discretion with us. Not only so, but

17. Rule 93(i) of the Local Civil Rules.

18. Rule 7(a) of the General Rules of the United States Court of Appeals for the District of Columbia Circuit.

we, by rule,[19] require an applicant to pay a fee of $50.00 for the express purpose of financing "an investigation of the character and fitness of such applicant" by the National Conference of Bar Examiners. It is common knowledge that those investigations are wholly confidential.

In Laughlin v. Clephane[20] plaintiff Laughlin brought an action against the members of the Committee on Admissions and Grievances of the District Court. In his second count Mr. Laughlin complained of alleged irregularities in examinations of applicants for admission to the bar and in the denial of admission to a large percentage of those who applied. He prayed that the examination papers be preserved, subject to order of the court. The District Court held that it had inherent as well as statutory power to control admission to its bar; that it had a right to call to its assistance members of the bar; that the examination properly involved the moral character of the applicant; that the examination papers were not part of the records of the court but belonged exclusively to the Committee; and that "The court did not rely upon the examination papers but upon the report of the Committee."[21] The court concluded that it had no jurisdiction in that count. It said to plaintiff Laughlin that the remedy was an informal complaint made to the judges as an appeal to their discretion. At the same time the court said, however, that if an applicant for admission feels that he has been wronged remedies are available, citing Carver v. Clephane.[22]

In Carver v. Clephane appellant brought a civil action to compel the Committee on Admissions and Grievances to certify him for admission to the bar. Mr. Laughlin was counsel for the plaintiff in that action. It developed that the Committee had found Carver (in the language used later by this court) "lacking in that good moral character which should be possessed by members of the bar." The District Court dismissed the action because Carver "failed to establish such qualifications as to character as to warrant his admission * * *." Carver presented affidavits as to his good character, but it seems that he had failed to mention in his applications certain difficulties with the Patent Office. It seems to me that the holding in that case is pertinent to the problem here, and it is there stated better than I can rephrase it. This court said: "The matter concerns the integrity of the court's bar. Within very wide limits, standards of fitness for membership in the bar of the District Court are for the District Court itself to establish and maintain. In our own opinion, appellant's lack of candor in his repeated applications for admison to the bar is reason enough for his exclusion. If his statements in those applications were not expressly false, they carried false implications."

The court calls attention to the fact that in the Carver case there was a hearing in the District Court. The minute which appears in the record in that case says that the case was "Argued and submitted". The conclusion of that court was that Carver "has failed to establish such qualifications as to character as to warrant his admission at this time". This court sustained that action. The "hearing" was an opportunity for the applicant to say what he had to say. He failed to persuade the court, and so he failed of admission.

In Spears v. State Bar of California[23] the applicant stated, on his application, that he had "never been charged before any court with crime * * *." He failed to mention a few episodes in which charges had been dismissed. The bar examiners declined to certify his character, and he moved for admission notwithstanding that refusal. The California Supreme Court, sitting en banc, in a unanimous opinion, recited that an applicant is charged with a duty of full disclosure, and continued: "We are aware that this requirement calls for a high degree of frankness and truthfulness on the part of the attorney making application for admission to prac-

19. Id., Rule 7(b).

20. D.C., 1947, 77 F.Supp. 103.

21. Id., 77 F.Supp. at page 106.

22. 1943, 78 U.S.App.D.C. 91, 137 F.2d 685.

23. 1930, 211 Cal. 183, 294 P. 697, 72 A. L.R. 923.

tice law in this state, but no good reason presents itself why such a high standard of integrity should not be required. This duty to make a full disclosure is an absolute duty, and a justification for a failure to perform it is not to be found in the excuse that an applicant has been advised by some person, no matter how high in official position that person may stand, that such disclosure is not necessary, nor by the sophistic argument that the charges having been dismissed or the disbarment proceedings dropped, in effect no charges were preferred or proceedings instituted, and applicant is therefore justified in stating under oath that no charges were in fact preferred or proceedings for disbarment instituted."

Applicant Spears said that he misinterpreted the phrase "charged with" to mean "charged with and convicted of", a startling approximation to the situation in the case at bar. But the court held that the burden of establishing good moral character was upon the applicant and that if he "falls short of convincing the committee of bar examiners, it is their privilege and their duty to refuse to recommend such applicant for admission to the bar of this state." And the court said that it would follow the committee "unless a convincing showing is made by the applicant to the court that such adverse recommendation is not based .upon sound premises and valid reasoning."

This court says that denial of admission to the bar is a judicial act, and it cer-. tainly is in the sense that it is a function of the judiciary. But not every judicial act requires an oral hearing. The Rules of Civil Procedure [24] specifically provide that motions may be determined by a court without oral hearing; and a court may hear a motion upon evidence in the form of affidavits;[25] and see Federal Communi-

cations Comm. v. WJR, the Goodwill Station.[26] And, in so far as the authority to write bonds for pay is concerned, I point out that under the statute generally applicable to the Federal Government [27] the granting of such authority is clearly an executive function, vested in the Secretary of the Treasury.

The court says that to reject an applicant for admission to the bar there must be such a hearing and opportunity to answer as would constitute due process. Due process of law is, of course, a term of variable content. The due process for admission to the bar at the common law was, in essence, a call, and the call came from the Benchers of the Inns of Court, each to the bar of their respective courts. The call was upon an estimate of demonstrated merit.[28] By a statute of 1402, 4 Henry IV, c. 18,[29] it was directed "That all attornies shall be examined by the justices and by their discretions their names put in the rolls * * *." And by a statute of 1605, 3 James I, c. 7,[30] the process of selection based upon dealings found to be skillful and of honest disposition is specifically provided. That procedure constituted due process at the common law in respect of admission to the bar and is the due process incorporated into our law. The concept of admission as of right upon evaluation of evidence presented in open hearing is the antithesis of the concept of call for demonstrated merit. Thus, I do not find in due process requirements as to admission to the bar any support for the view now taken by this court. Rather I find in them support for the view which I take and which I have described.

The court bases its decision largely upon In re Summers.[31] I do not read that case as my brethren do. Summers had been denied admission to the bar on the sole ground that he was a conscientious objec-

24. Rule 78, 28 U.S.C.A.

25. Rule 43(e).

26. 1949, 337 U.S. 265, 69 S.Ct. 1097, 93 L.Ed. 1353.

27. Supra note 11.

28. 2 Holdsworth, History of English Law 484 et seq. (1936); Green, The Courts' Power Over Admission and Disbarment, 4 Tex.L.Rev. 1 (1925), and the many references made therein.

29. 1 Ruffhead, Statutes at Large 451.

30. 3 Ruffhead, Statutes at Large 52.

31. 1945, 325 U.S. 561, 65 S.Ct. 1307, 89 L.Ed. 1795.

tor to war. The point in the decision, as I read it, was that if denial of admission impinges upon a right (in that instance freedom of religion) protected by the Federal Constitution against state impingement [32] a case for the federal courts is presented. The Court referred to the Illinois court as being "charged particularly with the protection of justice in the courts of Illinois through supervision of admissions to the bar".[33] And the Court said that "The responsibility for choice as to the personnel of its bar rests with Illinois."[34] "Supervision" and "choice as to the personnel" are certainly not apt to describe a judicial action restricted by evidence upon an open record and the full privileges of the customary due process of law proceeding. Rather they are descriptive of a discretionary process. I do not find in the opinion any intimation that a judgment upon an applicant's qualifications for the bar is other than a discretionary "choice as to the personnel" and within the supervisory power of the court to which the application is made. Summers's qualifications were assumed for purposes of jurisdiction. The problem was posed in this fashion: Assuming that applicant is fully qualified, may he be rejected expressly and solely for a reason inherently religious? And that is the sum of that case as I read it.

I should add in respect to In re Summers that I do not read the discussion of "ministerial" and "judicial" in that opinion as my brethren read it. My understanding is that the Court accepted the view of the Illinois courts that admission to that bar is a ministerial act, although performed by virtue of judicial power; that nevertheless, for purposes of the Federal Constitution, the federal courts must determine whether the proceeding is a case or controversy; and that when denial of admission is by judicial order it is a case which may be reviewed "when federal questions are raised". In sum, the Court said that a ministerial order of a state court can be tested for substantive constitutional validity. But I find no intimation that the Court meant to take over supervision of the procedure by which state courts determine admissions to their bars. But that is the clear result of the present ruling that a denial of admission must be by a procedure which conforms to procedural due process in the ordinary sense. In this connection the opinions in the Lockwood [35] and Secombe [36] cases, ancient milestones in this law, are interesting reading.

I suggest that some astonishing results may flow from the conclusion of the court in this case. Scores upon scores of applications for admission to the bar are denied every year upon confidential data and without hearing. The examinations by which the legal qualifications of applicants are determined are graded in confidence. The inquiries by which their moral qualifications are ascertained are confidential. Almost all rejections for admission to the bars of the courts of this jurisdiction are upon confidential data and without hearing. I think erstwhile rejected applicants will learn with both surprise and pleasure that they have a constitutional right to a public revelation of the data upon which they were rejected and to a hearing such as would constitute ordinary due process of law, which would, I suppose, include the right of cross examination. And I am inclined to predict that the uninhibited comments customarily responsive to the inquiries concerning a candidate for the bar will summarily cease when the answers are liable to introduction in open hearing and subject to cross examination.

The court says that the idea that this decision means courts must grade examination papers is erroneous, since the District Court is under no obligation to form a judgment independently of expert opinion. The court means, as I understand it, that the extent of an applicant's professional

---

32. The Court held freedom of religion to be protected by the Fourteenth Amendment.

33. Supra note 31, 325 U.S. at page 570, 65 S.Ct. at page 1312.

34. Ibid.

35. Ex parte Lockwood, 1894, 154 U.S. 116, 14 S.Ct. 1082, 38 L.Ed. 929.

36. Ex parte Secombe, 1857, 19 How. 9, 60 U.S. 9, 15 L.Ed. 565.

ability is shown by the expert opinion of the bar examiners, which is "properly before [the] court" and upon which that court may rely. But if the proceeding is an ordinary due process of law proceeding in which an expert opinion is presented in support of one adversary position, surely the opposing party must be permitted to cross-examine the expert as to the basis for the opinion and may introduce expert witnesses of his own upon the controverted issue; *i. e.*, in this instance his professional ability.

I realize that some courts have held just exactly what I view with alarm in this case. In Salot v. State Bar of California [37] the Supreme Court of California discussed at great length whether the applicant was properly marked less than 2,345 points on a combination of "essay questions" and "Yes-No questions" on the bar examination. But that opinion graphically depicts the difficulties which arise when such a proceeding is undertaken.

I said that I do not agree that admission to the bar and authority to write bail bonds for pay are alike in all pertinent respects. In Ex parte Garland [38] the Supreme Court said: "The profession of an attorney and counselor is not like an office created by an act of Congress, which depends for its continuance, its powers and its emoluments, upon the will of its creator, and the possession of which may be burdened with any conditions not prohibited by the Constitution." Absent a statute there is no right in any individual to go surety on a bail bond, and at the same time, contrariwise, there is no impediment to any person's going bail provided he meets the approval of the court in a particular case. An accused need not produce a so-called professional bondsman but may present a friend or relative or other person who has the requisite resources. And, at the same time, the court need not accept a proffered professional bondsman in any given case but must approve each bond and its surety. These characteristics distinguish this authority from admission to the bar and demonstrate that the authority to write bail for pay is, even more than admission to the bar, a part of the actual operation of the criminal court itself.

Since this court now reverses the District Court, it must mean that this appellant Carter was entitled to more consideration than he received. So it is vital to remember what was and what was not afforded him by way of process, and what, if anything, was presented as evidence and what was not. This court holds, as I understand it, that the District Court cannot deny an application (for admission to the bar or for authority to write bail bonds for pay) except upon a judicial evaluation of evidence openly presented. I think that rule to be erroneous and potentially extremely dangerous to the administration of law in this jurisdiction.

This court says: "The record before that court showed without dispute that the appellant has the qualifications for a bondsman." In the first place, the District Court held that appellant did *not* have the qualifications for a bondsman. So the quoted sentence means that this court now undertakes to say whether certain facts do or do not demonstrate qualification. I think that none of our business. I think the matter of qualification to be within the discretion of the District Court. In the second place, I do not see how it can be said that the matter is "without dispute" when this court is flatly and unequivocally reversing the specific conclusion of the District Court upon the point. In the third place, the record shows that appellant said upon his sworn original application that he had never been "charged and/or convicted" of an offense whereas he had been so charged three times. We held in the Carver case, supra, that lack of candor was a sufficient basis for denial of admission to the bar. I think it sufficient here.

In so far as the present case might rest upon an alleged abuse of discretion by the trial court, we are faced with the lack of candor displayed by Carter in his original application. The question as to discretion

37. 1935, 3 Cal.2d 615, 45 P.2d 203.

38. 1867, 4 Wall 333, 71 U.S. 333, 378, 18 L.Ed. 366, 370.

is whether that is sufficient to negative an allegation of abuse, no matter what additional detrimental data may have been in the alleged confidential report. Upon authority of Carver v. Clephane, we must hold that the revealed, and established, facts are ample to sustain the action of the District Court in so far as discretion is concerned. This court, as I have pointed out, does not consider the case from that standpoint.

In my view, the standards for professional bailbondsmen and the judgment upon an applicant's qualifications are within the discretion of the trial courts; those courts may consider and act upon confidential data; to reverse a judgment of rejection an applicant must allege and prove that the court either acted upon some ground other than his qualifications or abused its discretion in evaluating his qualifications.

I would affirm the order of the District Court.

### On Rehearing in Banc

Before STEPHENS, Chief Judge, and EDGERTON, WILBUR K. MILLER, PRETTYMAN, PROCTOR, BAZELON, and FAHY, Circuit Judges.

EDGERTON, J., with whom BAZELON, J., concurs: This appeal was first heard by a division of three judges. Opinions were filed and the order of the District Court was reversed, Judge Prettyman dissenting. The District Court and its judges then renewed a previous motion to be made parties to the appeal, for leave to intervene, and for leave to submit a brief and make oral argument. They included in their renewed motion a request for a rehearing in banc. The entire motion was denied.

I think the entire motion should have been granted, in which view Judge Fahy as well as Judge Bazelon concurs. But the Solicitor General, who filed the motion as attorney for the District Court and its judges, also moved as amicus curiae for a rehearing in banc. This latter motion was granted. A rehearing was held in which the Solicitor General argued, as amicus curiae, in support of the position he had proposed to take as attorney for the District Court and its judges. Since the whole record is before us, no substantial purpose would have been served by making them formal parties. The fact that they were not made formal parties does not deprive us of jurisdiction. In re Carter, 85 U.S.App.D.C. 229, 177 F.2d 75; certiorari denied, Laws, Chief Judge et al. v. Carter, 338 U.S. 900, 70 S.Ct. 250, 94 L.Ed 554.

We adhere to the opinion formerly filed by the majority of the division of three judges. Judge Miller and Judge Fahy concur in the result of that opinion. The order of the District Court is therefore reversed and the case remanded for further proceedings not inconsistent with that decision.

Reversed and remanded.

WILBUR K. MILLER, Circuit Judge (concurring in the result). The question here is whether a judge of the United States District Court for the District of Columbia has power to deny renewal of a professional bondsman's lawfully granted authority upon the basis of an opinion, reached without a hearing, that he lacks the requisite qualifications.[1]

The history of this case is essential to understanding the legal problem which it presents. It began on November 18, 1947, when a judge of the District Court considered John W. Carter's application for authority to engage in the bonding business, found him morally and financially qualified, and granted such authority for a period of two years. Carter then engaged in the business.

About a month later, on December 19, 1947, the same judge entered an order revoking the authority because he wanted to make further investigation of Carter's moral fitness. He, and later other judges of the District Court, considered that revocation to be nothing more than a restoration of Carter's original application to a pending status. This appears from the fact that on June 8, 1948, the same judge

---

1. The governing statute is 23 D.C.Code § 608 (1940).

was joined by three others in entering an order denying "the application of John W. Carter to engage in the bonding business in criminal cases in this Court." The "application" thus denied was not a new one, but was that which had been granted November 18, 1947. The order of denial was based on a report made by the F. B. I. which the judges refused to disclose to Carter. In our decision on appeal,[2] we treated the two orders as having revoked the original grant, and set them aside on the ground that keeping the F. B. I. report secret offended against the due process clause.

The judges of the District Court sought certiorari to review our reversal of their revocation orders, but presumably permitted Carter to function as a bondsman during the brief remainder of the period of his authority. He was told, however, that, regardless of the long suspension, the District Court would regard his authorization as expiring on November 17, 1949, two years after its grant.

Consequently, on that day he filed an application for renewal. He showed that his financial status, which was acceptable before, remained unchanged. He filed affidavits as to good character, made by the same affiants who had supported his initial application. He also filed his own affidavit that, during his term, he had abided by the provisions of the statute.

The Supreme Court denied certiorari on December 12, 1949. The next day, without a hearing, a judge of the District Court entered the following order:

"The application of John W. Carter for renewal of his license to engage in the bonding business in this Court is denied on the ground that in the opinion of the Court he lacks the qualifications for a bondsman.

"The recent decision of the United States Court of Appeals in the case of In the Matter of John W. Carter, decided August 1, 1949, and not yet reported, relates solely

to revocation of a license once granted and does not apply to original applications, or to renewals, which are in the administrative discretion of the Court."

When he so ruled, the judge had nothing before him except the application for renewal and supporting papers and, presumably, the secret F. B. I. report. Carter appeals.

I agree with my brothers Edgerton, Bazelon and Fahy that the District Court's order should be set aside, but my reasons for reaching that conclusion are quite different from those of Judge Edgerton and Judge Bazelon. They adopt the reasons for reversal recited in the majority opinion of the panel of three judges who first heard this appeal.[3] Thus they treat Carter's request for renewal of his authority as though it were on the same footing as an original application for such authority, but nevertheless say it could not be denied without a due process hearing having been first afforded.

I disagree on both points. A bondsman's application for renewal is on a very different plane than is an original application, as I shall attempt to show hereinafter. If I were convinced that Carter's status as an applicant for renewal was the same as that of an original applicant, I should vote to affirm, because a mere application confers no property right, and no other federal right of an original applicant is asserted here which would be violated by a denial without a due process hearing.

Judges Edgerton and Bazelon rely upon In re Summers, 1945, 325 U.S. 561, 65 S.Ct. 1307, 89 L.Ed. 1795, which they apparently regard as holding that an application for admission to the bar may not be rejected unless the rejection is based "upon a proceeding which contains the elements of due process of law, i. e., a hearing and revelation of all data upon which a decision is to be based." [4] So they conclude, on the basis of the Summers case, that an original application for authority to engage in the bonding business may not

---

2. In re Carter, 1949, 85 U.S.App.D.C. 229, 177 F.2d 75, certiorari denied, 1949, 338 U.S. 900, 70 S.Ct. 250, 94 L.Ed. 554.

3. In re Carter, No. 10504, decided January 18, 1951.

4. In re Carter, supra, note 3.

be rejected except after a due process hearing.[5]

I do not understand the holding of the Summers opinion to be that which those two of my colleagues find in it. Summers' application for admission to the Illinois bar was denied by the highest court of the state because he would not, being a conscientious objector, swear to uphold the Illinois constitution, which requires men of his age to serve in the militia in time of war.

The Supreme Court of the United States, recognizing that under the state law the Illinois Supreme Court had acted ministerially, pursuant to judicial power, in rejecting the application, nevertheless took jurisdiction under Article III of the Constitution of the United States to determine whether Summers' constitutionally derived right to the free exercise of religion had been denied or abridged by the rejection of his application. The Court decided that his constitutional right had not been denied or abridged thereby, and so affirmed the Illinois decision. It seems perfectly plain, therefore, that Summers' assertion that his religious freedom had been violated was the sole reason which impelled the Supreme Court to exercise jurisdiction.

The Court's opinion does not indicate that Summers claimed he had been deprived of any sort of property right without due process of law. Had he made such a claim, I am quite sure the Supreme Court would have rejected it, for it is clear to me that one does not acquire any sort of constitutionally protected property right simply by *applying* for admission to the bar. If that be true, it follows that no such right is acquired by merely applying for initial authority to act as a bondsman in the District of Columbia.

In our opinion on Carter's first appeal,[6] we said:

"* * * when an authorization to engage in the bonding business has been approved by the District Court and is outstanding, it can be revoked, prior to the expiration of its term, only upon a proceeding which contains the elements of due process of law, i. e., a hearing and revelation of all data upon which a decision is to be based."

This holding was based upon what we called "the key and controlling fact in the situation", which we described thus:

"* * * The application had been granted. Carter had an authorization. He was engaged in business. The action of the court was not to deny him something he was seeking; it was to deprive him of something which he had."

That is to say, Carter had acquired a property right, protected by the Constitution. We added, in the first opinion:

"It may be true that the grant of authority to engage in the bonding business is an administrative act. But the deprivation of that right, once granted, is a judicial act, requiring due process of law."

Unfortunately, we also said in the course of the opinion, 85 U.S.App.D.C. at page 230, 177 F.2d at page 76:

"* * * It is also clear that the authorization is for a term, at the expiration of which the same considerations govern renewal as govern original approval * * *."[7]

The foregoing statement was *obiter dictum*. When we wrote it, Carter's original term had not expired, and so we were not considering an application for renewal. Indeed, in another part of the same opinion we took care to emphasize that the case then before us "does not concern the power or procedure of that court [the District Court] in renewing an authorization upon expiration of the stated term."

---

5. The opinion cited in the foregoing note includes this sentence:
"* * * Since a court's order denying an application to practice law is a judicial act, as the Supreme Court determined in the Summers case, so is a court's order denying an application to do business as a bondsman."

6. In re Carter, supra, note 2, 85 U.S. App.D.C. at page 232, 177 F.2d at page 78.

7. Strictly speaking, the quoted language referred, not to the statute, but to the rules of court promulgated under it. If it accurately construed the rules, then the rules go beyond the statute.

Consequently, we have presented to us now, for the first time, the question whether "the same considerations govern renewal as govern original approval."

Having decided that Carter's right to do business was, during the original two-year period, a property right of which he could not be deprived without due process of law, we are now squarely confronted with the question whether that property right is extinguished when the stated term expires, with the result that renewal may be denied *ex parte*, or whether a hearing must be afforded before such denial.

If Carter's authorization was a property right during the term, it was no less a property right as the term ended. So, the refusal to renew deprived him of property, in both practical and legal effect, just as surely as did the revocation during the term. Although the authorization was for a stated period, since it was nevertheless constitutionally protected property, he had a right to believe it would be continued so long as he did not lose the statutory qualifications the court had originally found him to possess. He established a business upon that reasonable expectation. This language used by the Supreme Court of Iowa [8] is apropos:

"* * * Where the state confers a license to engage in a profession, trade or occupation, not inherently inimical to the public welfare, such license becomes a valuable personal right which cannot be denied or abridged in any manner except after due notice and a fair and impartial hearing before an unbiased tribunal. Were this not so, no one would be safe from oppression wherever power may be lodged, one might be easily deprived of important rights with no opportunity to defend against wrongful accusations. This would subvert the most precious rights of the citizen.

"The state cannot, by issuing only annual licenses, ingeniously thwart these precious rights."

I think the foregoing is a sound statement. It follows that the "key and controlling fact in the situation" is the same as it was on the first appeal:

"* * * Carter had an authorization. He was engaged in business. The action of the court was not to deny him something he was seeking; it was to deprive him of something which he had."

Upon the basis of that controlling fact, we said in the first Carter opinion, "the deprivation of that right [to engage in the bonding business], once granted, is a judicial act, requiring due process of law." That is still true, in my opinion. And it is true, whether the deprivation be by revocation of the right or by denial of an extension of its term.

The principle just stated protects the individual in his personal rights and works no harm to the public interest. For, if evidence subsequently obtained tends to indicate that the court erroneously and improvidently determined a bondsman to be qualified in the first instance, or if an originally well qualified bondsman becomes disqualified, the court may deny him the right to continue either by revoking his current authority or by refusing to renew it. But, in either event, the determination that he is unworthy to retain his valuable property right is the exercise of a judicial function which must be preceded by a due process hearing.

The statute does not stand in the way of the principle stated in the foregoing paragraph. It does not provide that a bondsman shall be relegated to the position of an original applicant when his fixed term expires, but rather indicates the contrary by saying that "before said authority shall be renewed the court shall require * * * an affidavit that since his previous qualification * * * he has abided by the provisions of this chapter". This is the sole statutory reference to procedure on renewal.

A bondsman's business is necessarily a continuing one. Though he had served only briefly, Carter was surety on bail bonds aggregating some $24,000 on the day the court refused to renew his authority. When the court found that he lacked the qualifications of a bondsman, it did not, I suppose, relieve him of liability on the bonds then outstand-

8.  Gilchrist v. Bierring, 1944, 234 Iowa 899, 14 N.W.2d 724, 732.

ing. Some of those bonds may remain in effect for many months. So, if it did not terminate all his liability when it refused renewal, the court continued to that extent to accept him as a bondsman, after finding that he lacked the required qualifications.

It was suggested in argument that Carter could terminate liability by surrendering his principals. Perhaps so. But not without refunding to each a part or all of the fee which he had been paid. This would deprive Carter of his property in the money refunded.

It is held by some courts that a license is a privilege and is in no sense a property right, even during its term. See the cases collected in 53 C.J.S., Licenses, § 2, p. 449. This court, has held otherwise with respect to a license to engage in a business. United States ex rel. Daly v. MacFarland, 1907, 28 App.D.C. 552, 561. And we held in the first Carter case that a bondsman's authority is a property right during its term. That being true, I think there is no valid distinction between revocation and refusal to renew, since the same consequences flow from both. Due process of law, being required for the one, should be and is required for the other.

The propositions set forth in this opinion, which are the basis for my conclusion that the order appealed from should be reversed, are amply supported by well-reasoned, convincing authorities. Leakey v. Georgia Real Estate Comm., 1949, 80 Ga. App. 272, 55 S.E.2d 818; State ex rel. Bierring v. Swearingen, 1946, 237 Iowa 1031, 22 N.W.2d 809; Gilchrist v. Bierring, supra; 45 Col.L.Rev. 67 (1945). Compare the following: Churchill Tabernacle v. Federal Communications Comm., 1947, 81 U.S.App. D.C. 411, 160 F.2d 244; Evangelical Lutheran Synod, etc. v. Federal Communications Comm., 1939, 70 App.D.C. 270, 105 F. 2d 793; Journal Co. v. Federal Radio Comm., 1931, 60 App.D.C. 92, 48 F.2d 461; Chicago Fed. of Labor v. Federal Radio Comm., 1930, 59 App.D.C. 333, 41 F.2d 422; Technical Radio Laboratory v. Federal Radio Comm., 1929, 59 App.D.C. 125, 36 F.2d 111; Goldsmith v. Clabaugh, 55 App.D.C.

346, 6 F.2d 94, certiorari denied 1925, 269 U.S. 554, 46 S.Ct. 18, 70 L.Ed. 408.

PRETTYMAN, Circuit Judge, (dissenting): Chief Judge STEPHENS, Judge PROCTOR and I adhere to the views expressed in my dissent to the original opinion and decision of the court.[1] We are of opinion that this court has no jurisdiction to review orders of the District Court upon original applications for authority to write these bonds or upon applications for renewals thereof, except where an abuse of discretion by that court is charged. We think the present ruling will have a disastrous effect upon the control which Congress intended to, and did, give the District Court and the Municipal Court over professional bondsmen who write bonds in criminal cases.

Judge CLARK and Judge WASHINGTON took no part in this rehearing.

---

1. In re Carter, U.S.App.D.C., Jan. 18, 1951.