718 F.Supp. 525 (1989)
UNITED STATES of America
v.
STATE OF LOUISIANA.
Civ. A. No. 80-3300.
United States District Court, E.D. Louisiana.
August 4, 1989.
*526 *527 Nathaniel Douglas, Franz R. Marshall and Levern Younger, U.S. Dept. of Justice, Civ. Rights Div., Washington, D.C., for plaintiff.
John N. Kennedy, Sp. Counsel to the Governor, Baton Rouge, La., Joseph J. Levin, Jr. and Carla Calobrisi, Adams, McCullough & Beard, Washington, D.C., for State of La. and the Governor of State of La.
Margaret E. Woodward, New Orleans, La., for Bd. of Regents of the State of Louisiana.
W. Shelby McKenzie and Nancy Tyler, Baton Rouge, La., for Louisiana State University Bd. of Sup'rs.
William Jefferson, New Orleans, La., for Southern University Bd. of Sup'rs.
Robert A. Kutcher and Jan Marie Hayden, New Orleans, La., for Bd. of Trustees of State Colleges and Universities.
Thomas W. Todd, Chicago, Ill., for Grambling State Alumni Ass'n.
Henry N. Brown, Jr., Benton, La., for Bossier Parish School Bd.
Winston DeCuir, Dept. of Justice, Baton Rouge, La., for State Bd. of Elementary and Secondary Educ.
William J. Guste, Jr., New Orleans, La., for State Atty. Gen.
Before WISDOM, Circuit Judge, and CHARLES SCHWARTZ, Jr. and WICKER, District Judges.

REASONS FOR RULING
This matter is before the Court on motions[1] of the United States of America, the Southern University Board of Supervisors joined by the State Attorney General, and Grambling University Alumni Association to alter or amend judgment or for new trial.[2] The State, acting through the Governor, opposes the motions in most respects. The motions were taken under submission without oral argument. For the following reasons, the motions are now

*528 GRANTED IN PART and DENIED IN PART.[3]

1. Standing
A threshold question arises as to whether the Grambling Alumni Association, an amicus curiae, and the Southern University Board of Supervisors, a state agency, have standing to request relief from the Court's July 19, 1989 Opinion and Order. The Court also notes that the State Attorney General has at least in part joined Southern's request for relief.[4]
The Court finds it unnecessary to address any standing issues at this juncture. However, the Court would observe that, as an amicus, Grambling lacks standing to prosecute independently any rehearing or appeal. Thus, the Panel has discretion to consider arguments raised by Grambling in conjunction with any other party's request for rehearing, but the Court is not bound to afford relief to an amicus apart from relief appropriate for those who are actual parties. Accordingly, the Panel has reviewed the matters raised by Grambling in conjunction with those raised by the United States, Southern, the Attorney General and the State through the Governor.

2. The Merits
Rule 59 of the Federal Rules of Civil Procedure permits the granting of a new trial "for any of the reasons for which rehearings have heretofore been granted in suits in equity in courts of the United States." Moreover, although the rule speaks expressly to "trials" and "judgments," "[t]he concept of a new trial under Rule 59 is broad enough to include a rehearing of any matter decided by a court without a jury." See 11 C. Wright & A. Miller, Federal Practice and Procedure § 2804, at 35. The general grounds for a new trial or rehearing are broad and include contentions that the decision in question is against the weight of the evidence, that the trial was unfair or that the Court committed a prejudicial error of law. See id. § 2805, at 37-38. Against this background, the Court will address what it perceives as the salient points raised by the memoranda.

A. Desegregation of Faculty and Staff[5]
Desegregation must be fostered at all levels of the State's higher education system, not just at the Board level and the student body level. It was never the Panel's intent to exclude faculty and staff from desegregation of the university system. Accordingly, the Court's Order of July 19, 1989 is hereby amended to require that the State desegregate the staffs and faculties of all public institutions, as detailed in the Supplemental Order issued simultaneously with these Reasons for Ruling.

B. Termination of Powers of the Four Governing Boards[6]
The Court further deems it appropriate to clarify the actual termination of the four boards' powers, as requested by the United States. Again, this matter is specifically addressed in the Court's Supplemental Order, which provides in essence for the four governing boards to cease operation upon appointment and confirmation of the single Board or, if appointment and confirmation are not timely achieved, upon the Court's *529 appointment of the Board with the assistance of the Monitoring Committee.

C. Reports of the Monitoring Committee
By ordering that the Monitoring Committee shall file its reports,[7] the Panel intended those reports to be maintained in the public record of these proceedings. Accordingly, the Court will specifically supplement its Order by requiring the Clerk of Court to mail copies of the reports to all trial attorneys of record.

D. The Applicable Legal Standards for Liability and Remedial Relief
Southern contends that a new trial should be granted because the Court committed an error of law by fashioning its remedy on constitutional grounds rather than on Title VI grounds. For reasons set forth in this Court's opinion of August 2, 1988,[8] the Court rejects this contention. We there held that "whatever relief is available to a private plaintiff in a school desegregation suit under the Fourteenth Amendment is available to the United States under Title VI."
Southern also contends that the Court erred in failing to give sufficient weight to the Department of Health and Welfare (HEW) criteria for Title VI desegregation. Southern argues that the criteria articulated by HEW for evaluating desegregation plans should be binding on this Court in fashioning a desegregation remedy. That argument is erroneous.
The HEW criteria were issued as guidelines for securing voluntary compliance. The voluntary compliance period has passed by the time a Title VI complaint is lodged in federal court. As David S. Tatel, then director of HEW's Office for Civil Rights, wrote in the introduction to the Revised Criteria Specifying the Ingredients of Acceptable Plans to Desegregate State Systems of Public Higher Education, 43 Fed.Reg. 6658 (February 15, 1978):
Where HEW has found that a state has not eliminated the remaining vestiges of segregation in its formerly dual system of public higher education, and is, therefore, in violation of Title VI of the Civil Rights Act of 1964, it is required first to attempt to secure compliance by voluntary means. When those efforts fail, HEW is required to seek enforcement either administratively or through the courts [citations omitted]. These revised criteria are issued to assist such states in the preparation of desegregation plans as part of the process of securing voluntary compliance.

Id. (emphasis added). Thus, as stated in HEW's own introduction to its criteria, those criteria are intended to apply only during the voluntary compliance period. That period ends prior to the commencement of litigation. Therefore, the HEW criteria are not intended to be applied by courts adjudicating Title VI violations.
Southern also contends that application of constitutional standards is more burdensome than application of the HEW criteria. That contention is false. HEW criteria must themselves pass constitutional muster by meeting or exceeding the constitutional standards of the Fourteenth Amendment. The HEW criteria were issued pursuant to Title VI, which Congress enacted to secure the guarantees of the Fourteenth Amendment. It would, therefore, be anomalous to suggest the HEW criteria could embody standards lower than those of the Fourteenth Amendment. As the Fifth Circuit Court of Appeals has observed, "There is no question but that Congress understood that Title VI's standard is that of the Constitution." United States v. Marion City School Dist., 625 F.2d 607, 615 n. 20 (5th Cir.1980), cert. denied 451 U.S. 910, 101 S.Ct. 1980, 68 L.Ed.2d 298 (1981).[9]

*530 E. Quotas and Admissions Exceptions
The United States objects to the Court's admissions exceptions, which generally require that each school institute admissions standards such that at least ten percent of the incoming students for the school be other-race students. The United States argues that this provision fails to satisfy the strict scrutiny test recently articulated in a non-school context in City of Richmond v. J.A. Croson Co., ___ U.S. ___, 109 S.Ct. 706, 720-23, 102 L.Ed.2d 854 (1989) (plurality); 109 S.Ct. at 735 (Scalia, J., concurring). In an attempt to suggest that this provision is unconstitutional or, at least, not remedial, it characterizes the provision as establishing a rigid, inflexible, unnecessary quota system. The United States misconstrues the provision.
In adopting the Special Master's recommendation on this provision, the Court was mindful of the hesitancy federal courts properly have in establishing race-conscious remedies. As Justice O'Connor recently wrote: "Classifications based on race carry a danger of stigmatic harm." Id. at ___, 109 S.Ct. at 721. Nonetheless, at times, such remedies are required to best remedy or simply to "remedy prior racially discriminatory actions by the State that violate the Fourteenth Amendment." United States v. Paradise, 480 U.S. 149, 188-189, 107 S.Ct. 1053, 1076, 94 L.Ed.2d 203 (1987) (Stevens, J., concurring). With this understanding, the Court addresses the objections to the provision.
First, unlike the City of Richmond, which had not made legitimate, articulated findings of prior discrimination against "Blacks, Spanish-speaking [citizens], Orientals, Indians, Eskimos, and Aleuts" in the city's construction industry, see Croson, ___ U.S. ___, 109 S.Ct. at 723-28, this Court has made a specific judicial finding of prior discrimination with lingering segregation in Louisiana's entire public higher education system. Indeed, such a finding was the very basis for summary judgment against the State.
Second, the admissions provision is not an overreaching remedy such as was found to be impermissible in Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (Milliken I). Instead, the provision directly addresses and relates to the constitutional violation itself. See Milliken v. Bradley, 433 U.S. 267, 282, 97 S.Ct. 2749, 2758, 53 L.Ed.2d 745 (1977) (Milliken II). Unlike the original interdistrict remedy at issue in Milliken I, the admissions provision here does not attempt to impose remedial provisions that reach beyond the scope of the violation; the Court has not imposed remedial provisions on Louisiana's public primary or secondary schools or even on the two state institutions of higher learning against which the Court found no liability (viz., Bossier Parish Community College and St. Bernard Parish Community College).[10]
Nor is the admissions provision inflexible as the United States perceives it to be. Cf. Pasadena City Board of Educ. v. Spangler, 427 U.S. 424, 434, 96 S.Ct. 2697, 2703-04, 49 L.Ed.2d 599 (1976). It was not the Court's intent that the figure of ten percent be deemed immutable or unchangeable in the inevitable change of circumstances. Cf. Martin v. Wilks, ___ U.S. ___, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989). The Court has not attempted to require that the schools have a particular racial balance; such would ignore the wealth of non-race related factors that may legitimately affect racial make-up at different schools and organizations. Cf. Bazemore v. Friday, 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986); Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 24, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971). Instead, the provision is merely a useful starting point in the process of shaping the remedy. See id. at 25, 91 S.Ct. at 1280.
The provision should not be read to imply an absence of general equitable waiver conditions *531 in the event the provision proves unworkable. Cf. Paradise, 480 U.S. at 186-187, 107 S.Ct. at 1075 (Powell, J., concurring); Croson, 109 S.Ct. at 729. If the Supervisory Board after having addressed the issue with the Monitoring Committee finds, based on more than just an administrative dislike of the Court's remedial duties in general, that the provision is failing to achieve the intended purpose of fostering desegregation, then it should seek appropriate changes at that time. In retaining continuing jurisdiction over desegregation cases, courts do not act solely to find a party in contempt for not obeying their injunctive orders or to enforce judgments as in any civil case. To the contrary, the very concept of continuing jurisdiction recognizes the Court's ability, its duty, to modify remedial orders as and when appropriate. While the Court cautions that it is not suggesting that it will be receptive to resolving quotidian disputes  indeed, it is not the Court's function to do so, and to do so would denigrate the function of not only the Monitoring Committee, but also and more importantly the State Board  the Court's primary function should not be considered to have ceased upon its ordering the State to implement the remedial plan. See United States v. Lawrence County School Dist., 799 F.2d 1031, 1043 (5th Cir.1986), reh'g den. 808 F.2d 1063 (5th Cir.1987) (en banc).
The United States suggests that alternative measures largely reminiscent of those in the consent decree would achieve the desired goal of desegregation with all deliberate speed as well as or better than the Court's provision. The Special Master considered and, at least implicitly, rejected the suggested alternatives as insufficient. This finding is not only not clearly erroneous, but is eminently correct as the utter failure of the consent decree confirmed.
Nor does the modest provision seek to remedy prior discrimination by means of "over-correction." Cf. Paradise, 480 U.S. at 198-199, 107 S.Ct. at 1081 (dissent) (criticizing the majority's acceptance of the State's 1-for-1 trooper promotion quota that "far exceeded the percentage of blacks in the trooper force"). The initial ten percent figure is simply not disproportionate relative to the overall racial balance within the entire higher education system. Despite the United States' fear, the provision should not have the effect of punishing the innocent, for the provision does not tend to exclude an otherwise potential student from attending a Louisiana public college; the provision does not shut off Louisiana's public higher education system to anyone. Instead, the provision must be viewed in its proper context, namely, as complementary to selective admissions provisions; the general purpose of selective admissions provisions is to avoid "white flight" and lingering segregation that has occurred where there were duplicative programs, while the exceptions provision ameliorates any detrimental side effects that selective admissions might have on minority students.
Meanwhile, Southern appears to take an opposite position on the Court's rejection of the Special Master's recommendation that the new supervisory Board be initially over-represented by black members relative to either the general State population, the State academic or student population, or the available qualified persons for Board membership.[11] Again, and sensing that Southern is perhaps less concerned with desegregation than with maintaining its power as a political institution of the State, the Court disagrees.
The Court stresses that a federal court cannot be, and is not and must not be, faced with a Hobson's choice whenever it adopts a remedial plan that must, by necessity, address a broad concern. See Swann, 402 U.S. at 28, 91 S.Ct. at 1282. Just because a limited, flexible race-conscious *532 provision may be appropriate to remedy one particular problem does not mean that such a provision must or should be imposed to address different problems; in other words, what is narrowly tailored for one particular problem may not be for another.
Southern suggests that the Court acted impermissibly in rejecting the Special Master's recommendation because the Court did not find the Special Master's finding of fact on this point to be clearly erroneous. Southern misperceives the basis of the Court's ruling. The Court did not disagree with the Special Master's findings of fact. Instead, the Court disagreed with the legal conclusion to be drawn from his findings; these conclusions of law, the Court repeats, are subject to de novo review.
A requirement of interim over-representation on the new Board would fail any "narrowly tailored" test. With the new board, there can logically be no finding of prior discrimination by the Board; thus, it is difficult to conceive how such a provision should be construed as a remedy and as not an impermissible requirement that a particular racial mix must be maintained.[12]
The Court comments briefly on certain material distinctions between its adopting the admissions exceptions and its rejecting the Board over-representation: The former accommodates federal-state comity, whereas the latter cannot. The primary obligation to supervise and evaluate the success of or the need for change in the admissions provision lies with the board, which is a State entity chosen by persons elected by the citizens of the State; this provision avoids needless intervention and interference by federal courts. Necessarily, however, this Court and the Monitoring Committee would have to exercise active, interventionary supervision of the Board if an over-representation quota system were established, even temporarily, lest such system transform into an impermissible goal of fixed racial percentages of the Board (since the board is the State entity to supervise the State's higher education system, the Court and Monitoring Committee are by default the ones to supervise the Board). Thus, whereas a race-conscious remedy concerning student admissions is able to accommodate federalism concerns that permeate our constitutional system of dual sovereignty between the federal government and the states, a quota system for the Board cannot.

F. The Merger of LSU Law Center and Southern University Law School[13]
The separation of white students from black students in a manner disproportionately detrimental to the education of black students is clearly demonstrated by the coexistence of Southern University Law School, where virtually all the State's black law students go, and LSU Law Center, which had a 3.8% black student population (30 students) for the 1988 school year. Although this case has been pending since 1974, public legal education in Louisiana remains separate and unequal.
As stated in the Court's Opinion and Order of July 19, 1989, we accept the factual findings of the Special Master with regard to merger generally, and we have specifically reserved merger at this juncture for most of the State's geographically proximate "black" and "white" universities. Thus, Southern's invocation of the clearly erroneous rule is inapposite. The Panel departs from the Special Master's recommendation, however, in the Panel's application of the Master's findings of the legal question of remedy. We believe it would be legal error to evaluate desegregation from the standpoint of a single school *533 (LSU Law Center), rather than to evaluate the overall practical segregation of legal education perpetuated by maintaining the two law schools side by side. If painting with a broad brush were appropriate in remedying constitutional violations, which it is not, consideration of all state universities globally would have been permissible. But even as the Court concludes it is impermissible to achieve desegregation by merger of all of the State's proximate black and white institutions, the Court also concludes the problem of desegregating legal education merits particularized consideration and relief.
In making this particularized inquiry, the Panel shares the movants' concerns for providing access for minority students to quality legal education and for ensuring that any remedial action is carefully drawn so as not to disproportionately affect black students. However, the reality of legal education in Louisiana, as detailed by the Special Master's factual findings, is that black law students do not have the benefit of higher quality legal education. The Consent Decree experience worked no improvement in this area, and there is in the Court's view no reason to suspect that the unconstitutional segregation perpetuated by the two schools will resolve itself over time. The State's record for offering quality legal education to black students remains woefully inadequate.
Moreover, as detailed in the Court's Opinion and Order, merger of the law schools does not present the same problematic issues militating against merger as were discussed by the Special Master in the context of other universities.[14] There is no reason that all students should not have the benefit of the State's limited resources for legal education. It was with such concerns in mind as sharing resources (including the faculty's expertise, library and research facilities, job placement programs, etc.) and offering equal access to those resources that the Court ordered the present merger. It is with such concerns in mind that the Panel left open administrative matters such as new admissions standards for the newly merged law school and the number of students to be admitted.
The movants also assert that merger will result in limiting access to legal education to the disproportionate detriment of black students. The Court disagrees. Statistics for the two law schools show that as of 1987, enrollment at LSU numbered 702 students, with 20 minority students or a minority enrollment of 2.8%,[15] and enrollment at Southern totalled 343 students, with a minority enrollment of 199 or 58%, for a total enrollment of 1085, with 219 minority students or 20% minority enrollment.[16] For the sake of comparison, the Court takes judicial notice that Tulane University Law School, a private institution located in New Orleans with highly selective admissions standards, had a 1988-89 school year enrollment of 855 students, of which 18% were minority students.[17] Thus, even if the Board did no more than combine the two schools, the LSU system could still offer an opportunity for education of minorities in Louisiana comparable to that offered in the past year by Tulane University, one of the South's finest law schools. Surely the necessity for offering additional improved quality legal educational opportunities outweighs Southern's institutional loyalty in this instance.[18] And while concern *534 for the traditions and substantial alumni following of many of the schools and for the administrative complexities inherent in merger caused the Court to reject merger as an across the board remedy, the problem of legal education presents special concerns.[19]
A "court's equitable power to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." Swann, 402 U.S. at 15, 91 S.Ct. at 1276. This flexibility regarding remedies is especially called for in the context of legal education. Almost forty years ago in Sweatt v. Painter, 339 U.S. 629, 634, 70 S.Ct. 848, 850, 94 L.Ed. 1114 (1950), the Supreme Court recognized that a state's predominantly white law school might possess "to a far greater degree those qualities which are incapable of objective measurement but which make for greatness in a law school." These qualities include the reputation of the faculty, the position and influence of alumni, and even the prestige of the school.
Where the extent of the constitutional deprivation is great and other milder remedies have failed, courts have found the merger of educational institutions to be appropriate. Lee v. Demopolis City School Sys., 557 F.2d 1053, reh'g denied, 561 F.2d 831 (5th Cir.1977), cert. denied sub nom., Demopolis City School Dist. v. United States, 434 U.S. 1014, 98 S.Ct. 729, 54 L.Ed.2d 758 (1978) is such a case. Elementary schools located just over two miles apart remained one-race schools. Finding that milder measures had failed, the Court ordered the pairing of the schools. The merger of institutions of higher education was ordered in Geier v. Univ. of Tenn., 597 F.2d 1056, 1069 (6th Cir.), cert. denied, 444 U.S. 886, 100 S.Ct. 180, 62 L.Ed.2d 117 (1979), where the Court found that the merger order fell within its equitable powers and that the remedy would not pose significant administrative difficulty for the Court.

G. Enhancement Money
Our order does not say how much must be spent in implementing the plan. We refuse to name our price now. Our lack of specificity does not create an opening for those who would let meritorious programs wither for lack of sustenance. Instead, it emphasizes again that the State must implement the plan ordered by this Court, regardless of cost: the money must come to the remedy; the remedy will not bend to the money. Of course, we recognize that the Board charged with achieving equality of education must be financially responsible, and that part of its responsibility is attention to the fiscal problems of the State. That is part of the Board's task. It may find, for example, that quick elimination of duplicate programs may free funds for other programs. When necessary, the Board may obtain appropriate budgetary information from state agencies. Finally, this Court will watch carefully to safeguard both the letter and spirit of its Order.

H. Reverse Incentives
Our Order allows the Board to "consider" removing financial scholarships and other penalties from institutions that do not recruit and retain other-race students and faculty. There is little risk that this will become a way of punishing primarily black institutions. First, the Board will measure the institution's progress by annual goals that are "realistic" for the institution. For primarily black institutions, that goal will be partly based on those institutions' traditional special role in serving black students. Second, at least initially, the Board's involvement is more likely to be prospective rather than primitive and retroactive. The Board may designate for primarily black institutions new program *535 offerings that will attract other-race students. It is important to note that the Order does not require reverse incentives. Finally, abuse of reverse incentives to punish primarily black institutions is contrary to the intent of the Order. This Court which will oversee implementation of the Order will not allow such abuse of its Order.

I. Dr. Murrill's Appointment
We further reject Southern's contention that Dr. Paul W. Murrill's former status as chancellor of Louisiana State University A & M renders his appointment inappropriate. Dr. Murrill is presently Special Advisor of Gulf States Utilities Company of Beaumont, Texas, a post he has held since June 1987. From March 1982 to June 1984, he served as Chairman of the Board and Chief Executive Officer of Gulf States. Dr. Murrill is thus removed in time and vocation from his former position as Chancellor of Louisiana State University A & M and his presence on the Monitoring Committee presents neither a conflict of interest nor the appearance of a conflict. The Court has endeavored to appoint a qualified Monitoring Committee with geographical and racial diversity. As a Louisiana resident and educator, Dr. Murrill will bring a necessary dimension of experience and insight to the Monitoring Committee. Moreover, members of the Monitoring Committee have not been given unfettered discretion to make judgments concerning Louisiana's progress toward a further desegregated environment. The Court remains as the final arbiter of the results achieved under the new governance structure.

Conclusion
Southern complains generally that much of the remedial relief ordered is not tailored to the violations found and that the order invades areas of decision-making reserved to the State. In other areas, such as enhancement funding and imposition of quotas, Southern asserts the Court has not gone far enough. Curiously, the State Attorney General has joined Southern, even though the tenor of Southern's motion suggests no quarrel with the Court's finding of constitutional violations where this conclusion could be used by Southern to seek increased funding or other benefits for predominantly black schools. Moreover, the United States argued vigorously in its objections to the Special Master's Final Report that the remedies adopted in large part by the Panel did not go far enough. The Court's plan is a considered effort to reconcile innumerable interests and provide for specification of enforceable guidelines for ending desegregation while at the same time permitting flexibility in the day to day management of a university system. The Court cannot run Louisiana's system of higher education and enough flexibility must be provided for the administrative structure operate as it deems best, but within the parameters outlined by the Court. With the cooperation of the parties and the assistance of the Monitoring Committee, an ongoing effort can be made to adjust the Court's basic remedial plan to the State's continuing needs.
The State of Louisiana must have an adequate number of sufficiently educated workers to fulfill the needs of industry. Management tends to avoid areas where it perceives there is a shortcoming of public higher education. Black students under our present segregated system disproportionately and unconstitutionally bear the impact of such shortcoming.
These same black students will be disproportionately penalized in the work force, when their education has not helped prepare them for the competition they will encounter there. The evidence also overwhelmingly shows that segregation perpetuated by duplication of programs has wasted valuable and limited educational resources. The Court has taken great pains to fashion a starting place for the termination of segregation. This remedy envisions an on-going effort, with necessary adaptations as the educational system in Louisiana changes and hopefully rises to meet the challenge before it.
For all the above reasons, the Court declines to alter its remedial Plan, except in *536 certain particulars outlined above and detailed in the Court's Supplemental Order issued this date. The motions are therefore DENIED IN PART and GRANTED IN PART.

*537 APPENDIX A

*538 APPENDIX B

NOTES
[1] All motions were timely filed. See F.R.C.P. rules 6(a) and 59(b) & (e).
[2] The State Attorney General, Grambling and Southern have requested a stay of the Panel's Order of July 19, 1989, pending a determination of the merits of the motions for new trial and anticipated appeals by Southern and the State Attorney General. The State, acting through the Governor, opposes the stay. Grambling's motion for a stay was denied by Minute Entry of August 1. The motion for a stay filed by Southern and the State Attorney General was denied by Order and Reasons entered August 4, 1989.
[3] Simultaneously with the issuance of these Reasons for Ruling, the Court has entered a Supplemental Order specifying the particular relief granted as a result of the motions for rehearing and/or new trial. 718 F.Supp. 521.
[4] The State Attorney General expressly joins Southern's motion "insofar as such motion and memorandum object to the Court's finding of unconstitutionality of the Constitution and Laws of the State of Louisiana." This is puzzling, because the Panel does not read Southern's motion as challenging the Court's conclusion that the Louisiana system of higher education violates the federal Constitution. Rather, Southern challenges the scope of remedial relief ordered by the Court. We can only suppose that to the extent Southern supports the status quo, the State Attorney General joins Southern. However, Southern does not so limit its arguments.
[5] Both Southern and the United States seek clarification of the Panel's Order in this respect.
[6] The issues here discussed were raised by the United States.
[7] At least four reports shall be filed per year.
[8] See United States v. Louisiana, 692 F.Supp. 642, 649-50 & nn. 21-23 (E.D.La.1988).
[9] Because Southern does not specify what departures from the HEW criteria it contends this Court made, we cannot here address whether in fact there were such departures. In any event, the question of departures from HEW criteria is irrelevant to these proceedings because those criteria are inapplicable to Title VI adjudication for the reasons described above.
[10] While the Court indicated, primarily as a matter of what appears sound educational and administrative policy, that these two schools "should be incorporated into this system" of a new, single, comprehensive community college system in Louisiana, see Opinion and Order of July 19, 1989, at 37 (emphasis added), the Court did not impose any mandatory requirements on these two schools or on the State relative to these two schools.
[11] On August 2, 1989, the Governor appointed the 17 members to the new Board, of which six are black persons and six are women. For a list of the members' names along with a brief resume of each, see The (New Orleans) Times-Picayune, Aug. 3, 1989, at A-8, a copy of which is attached hereto as Appendix A. Although the Governor's choice remains subject to confirmation by the Louisiana Senate, the Governor appears to have laid to rest Southern's expressed fear that he would disregard black membership on the new Board.
[12] The Court separately notes that both the Special Master and Southern erroneously presumed that in determining whether blacks were adequately represented on the new Board, one should compare the ratio of black board members to the Board as a whole (which has turned out likely to be 35%, see supra note 11) with the ratio of black citizens to the entire population (or perhaps with the ratio of black students to all students attending Louisiana's State universities and colleges). The presumption is misplaced. See Wards Cove Packing Co. v. Atonio, ___ U.S. ___, 109 S.Ct. 2115, 2121-22, 104 L.Ed.2d 733 (1989); Croson, 109 S.Ct. at 724-25.
[13] Both the United States and Southern request reconsideration of this aspect of the Court's Ruling.
[14] See Final Report, pp. 36-37.
[15] By 1988, LSU Law Center had 3.8% black students. See Final Report, p. 13, Chart 1.
[16] These figures are taken from the figures for Law Schools on the 1987 Approved List of the American Bar Association. The Special Master did not make a particularized fact finding as to the number of students enrolled only at the Southern Law School for 1988; thus the Panel is unable to rely solely on the statistics set forth in Chart 1, p. 13 of the Special Master's Report.
[17] See Tulane Admissions Minority Fact Sheet, attached hereto as Appendix B.
[18] Another revealing statistical item is the relative size of the law libraries of LSU and Southern: As of fall 1987 LSU had 438,225 total book volumes and microfilm/microfiche equivalents, whereas Southern had 186,336. See D. Thomas, "1986-87 Statistical Survey of Law School Libraries and Librarians," 80 Law Library Journal 485, 487-88, 496 & 499 (1988). As of fall 1987, LSU ranked 19th in library volumes, whereas Southern ranked 94th in the country out of 175 schools. Given the paramount importance of legal research to the training of lawyers and the practice of law, leaving in place a system that so effectively limits minority student learning resources would ratify vestiges of past discrimination.
[19] Lest there be any doubt, it is precisely because the Court perceives closure and/or merger of universities as a viable remedy that the Court in its Opinion and Order expressly reserved the right to implement further closure in the future.