GLADYS DEL CARMEN GORBEA VALLÉS, JOSÉ ANTONIO GORBEA VA-LLÉS y OTROS, recurrentes, *v.* REGISTRADOR DE LA PROPIEDAD DE SAN JUAN, recurrido.

*Número:* RG-89-833          *Resuelto:* 10 de mayo de 1993

*Arturo Aponte Parés*, abogado de la parte recurrente; *Francisco M. Vázquez Santoni*, Presidente de la *Asociación de Notarios de Puerto Rico, Inc.*, y *Leila Sánchez*, Directora Ejecutiva de la *Asociación de Notarios de Puerto Rico, Inc.*, comparecen en calidad de *amicus curiae*.

EL JUEZ ASOCIADO SEÑOR ALONSO ALONSO emitió la opinión del Tribunal.

(En Reconsideración)

Nos corresponde decidir, en primer lugar, si este Foro tiene jurisdicción para entender en un recurso de reconsi-

deración instado por el *amicus curiae* y no por ninguna de las partes directamente involucradas en la controversia. En segundo lugar, si el Código Civil de Puerto Rico requiere que para que un *mandato general* cumpla con el requisito de ser expreso, dispuesto en el Art. 1604 (31 L.P.R.A. sec. 4425) el *poder* de representación concedido al que comparece al acto o negocio jurídico a nombre ajeno mencione que el inmueble objeto del mismo se encuentra localizado en Puerto Rico.

Por las razones que expondremos a continuación, resolvemos que tenemos jurisdicción para adjudicar el presente recurso de reconsideración, y que el que el *poder general* mencione la localización del inmueble dentro de nuestros límites territoriales y jurisdiccionales no es un elemento consustancial al requisito de ser expreso requerido por el Art. 1604 de nuestro Código Civil, *supra*. Veamos.

I

La señora Gorbea Balseiro otorgó un *poder general* (*power of attorney*) a Gladys Gorbea Vallés el 23 de junio de 1987 en la ciudad de Nueva York. *Al día siguiente fue debidamente autenticado, y subsiguientemente, el 30 de junio, protocolizado en Puerto Rico ante el notario Willian J. Riefkhol mediante la Escritura Núm. 18.* Esta Escritura fue acompañada como documento complementario a la Escritura Núm. 14 de compraventa, otorgada el 7 de julio de 1988 ante el notario Arturo Aponte Parés, y presentada para su inscripción en el Registro de la Propiedad de San Juan el 14 de julio de 1988.

El Registrador de la Propiedad (Hon. Oscar Olivencia Font) se negó a inscribir la escritura de compraventa fundamentándose en los señalamientos contenidos en la opinión de esta Curia en *Zarelli v. Registrador*, 124 D.P.R. 543 (1989), los cuales aplicó de forma retroactiva al caso de autos. A juicio del Registrador, el *poder* a favor de Gladys

otorgado en Nueva York no se ajustó a las normas jurídicas reconocidas por esta Curia, no encontrando margen para una interpretación prospectiva de éstas.

Los recurrentes Gorbea Vallés *et al.* argumentaron ante nos que debido a que el poder se otorgó y protocolizó en un momento en que la doctrina vigente lo permitía, debíamos concederle validez y aplicar prospectivamente la doctrina de *Zarelli v. Registrador*, supra.

Mediante Resolución de 8 de febrero de 1990 concedimos la petición de la Asociación de Notarios de Puerto Rico, Inc. para comparecer en calidad de *amicus curiae* y le brindamos un término de veinte (20) días para que se expresara sobre la controversia en cuanto a la aplicación retroactiva de la opinión y sentencia emitidas en *Zarelli v. Registrador*, supra. Compareció el *amicus curiae*, argumentando que no debíamos resolver en cuanto a la prospectividad o no de la doctrina de *Zarelli v. Registrador*, supra, sino más bien, debíamos revocar nuestros pronunciamientos respecto a la indispensabilidad de que el poder mencionara que el inmueble se localizaba en Puerto Rico.

El 30 de junio de 1992, mediante opinión de este Foro, resolvimos que al citado caso *Zarelli v. Registrador* debería dársele efectos prospectivos. *Gorbea Vallés v. Registrador*, 131 D.P.R. 10 (1992). Señalamos que "[d]arle efectos retroactivos ... inevitablemente conllevaría una injusticia, propiciaría múltiples denegatorias registrales y podría conllevar la nulidad de varios negocios". *Gorbea Vallés v. Registrador*, supra, págs. 18–19. No obstante, no accedimos a la contención del *amicus curiae* respecto a que el requisito de mencionar que el inmueble se localizaba en Puerto Rico constituía un formalismo innecesario que habría de crear grandes obstáculos e incertidumbre en el tráfico jurídico.

A esos efectos nuevamente compareció el *amicus curiae* y solicitó la reconsideración del dictamen de este Foro. El 9 de octubre de 1992 emitimos una resolución en la que or-

denamos a las partes expresarse sobre nuestra jurisdicción para entender en una moción de reconsideración sometida por un *amicus curiae* y sobre la parte de la opinión que requiere incluir en la redacción de los poderes información alusiva a la localización del inmueble objeto del poder dentro de la extensión territorial y el término jurisdiccional de Puerto Rico.

Las partes han comparecido. Examinados los recursos ante nos, decidimos reconsiderar.

## II

La figura del *amicus curiae* se rige por la Regla 43 del Reglamento de este Tribunal, 4 L.P.R.A. Ap. I-A. Tal disposición autoriza la comparecencia ante este Foro como amigo de la corte a cualquier parte realmente interesada. No obstante, no se trata de un derecho sino de un privilegio sujeto a la sana discreción del Tribunal. *Pueblo ex rel. L.V.C.*, 110 D.P.R. 114, 129 (1980); *Pueblo v. González Malavé*, 116 D.P.R. 578, 580 (1985). La discreción de este Tribunal para aceptar o solicitar la comparecencia de un *amicus curiae* es amplia. El lenguaje de nuestra regla es mucho más liberal que las disposiciones al respecto del Reglamento del Tribunal Supremo federal. La nuestra no requiere que las partes consientan en la participación del *amicus curiae*. La única condición que se exige es que éste sea una parte realmente interesada. 4 L.P.R.A. Ap. I-A, R. 43. Así, nuestra regla trasciende el ámbito limitado del sistema adversativo para aumentar las oportunidades de participación de los amigos de la corte; para propiciar que esta Curia, en vez de limitarse a las consecuencias inmediatas de su decisión para las partes litigantes, pondere, con mayor detenimiento, las repercusiones que *la norma jurídica* planteada tendría para otras partes interesadas. Esto no mediante la consideración abstracta de tales intereses, sino mediando la participación activa de los interesados.

Véase *Pueblo v. González Malavé*, supra, pág. 596, opinión disidente del Juez Asociado Señor Hernández Denton.

Como señaláramos en *Pueblo ex rel. L.V.C.*, supra, pág. 129:

> Ninguna persona o entidad, y ningún abogado, tiene derecho a intervenir como *amicus curiae* en un litigio. Su autorización para hacerlo debe responder, más que a su interés, a la necesidad del tribunal y a su propósito de estar mejor informado para hacer la más cumplida justicia. La obtención de esa ayuda puede canalizarse mediante solicitud hecha al tribunal o por iniciativa de éste, tomando en consideración, entre otros factores, el interés público del asunto bajo consideración, lo novel de las cuestiones planteadas, el alcance de la adjudicación que haya de hacerse en cuanto a terceros que no son parte en el litigio, las cuestiones de política pública que puedan estar planteadas, la magnitud de los derechos que puedan estar en juego, etc. No puede haber criterios fijos limitativos ni particularizadores de los factores a tomarse en consideración.

De esta manera, sujeto a la mejor discreción de este Foro, la determinación de autorizar o denegar la comparecencia de un amigo de la corte dependerá (1) del interés de la parte en la controversia y la normativa de derecho ante la consideración del tribunal, y (2) de la necesidad del tribunal de estar mejor informado en cuanto a las implicaciones prospectivas o generales de la misma.

En la experiencia norteamericana, de la que recibimos esta figura, tres (3) tipos de *amicus curiae* han comparecido con mayor frecuencia a los tribunales: los representantes gubernamentales, las organizaciones profesionales u ocupacionales, y las asociaciones privadas. E. Angell, *The Amicus Curiae American Development of English Institutions*, 16 Int'l & Comp. L.Q. 1017, 1019–1020 (1967). Se trata, en general, de partes que defienden una posición específica en cuanto a la normativa a adoptarse. Angell, *op. cit.*, págs. 1020–1021; Nota, *Private Attorneys-General: Group Action in the Fight for Civil Liberties*, 58 (Núm. 4) Yale L.J. 574 (1949); S. Krislov, *The Amicus Curiae Brief: From Friendship to Advocacy*, 72 (Núm. 4) Yale L.J. 694

(1963). *Pueblo ex rel. L.V.C.*, supra, pág. 127. Esto sin que se les llegue a considerar parte formal en el caso o se le permita controlar el curso de la litigación. Beckwith & Sobernheim, *Amicus Curiae—Minister of Justice*, 17 Fordham L. Rev. 38, 50 y 51 (1948); Covey, *Amicus Curiae Friend of the Court*, 9 (Núm. 1) De Paul L. Rev. 30, 30–31; 1B *Moore's Federal Practice* Sec. 0.411[6], según citados en *Pueblo ex rel. L.V.C.*, supra, pág. 127.

■ Estando sujeta a la discreción de los tribunales, la intervención del *amicus curiae* se ha permitido en diferentes momentos durante la tramitación de los pleitos. Así, sin ser exhaustivos, "se ha ordenado a un *amicus curiae* realizar descubrimiento de prueba ...; iniciar procedimientos adecuados y someter alegaciones y evidencia ...; participar en la investigación del fraude al tribunal ...; realizar una investigación y llevar a cabo una vista en un procedimiento de desacato ...". (Escolio omitido.) *Pueblo ex rel. L.V.C.*, supra, pág. 128. También se ha permitido cuando el tribunal aún no ha decidido si expedir o no el auto solicitado. Nota, *Amicus Curiae*, 34 (Núm. 7) Harv. L. Rev. 773, 774 (1921). En general, véase *Pueblo v. González Malavé*, supra, págs. 592–593.

En cuanto a la capacidad del *amicus curiae* de solicitar una reconsideración, no encontramos fundamento alguno que lo impida o que restrinja nuestra discreción de acogerla. Curiosamente, el primer caso del Tribunal Supremo federal en que se informa la figura del *amicus curiae* ante ese Foro, su participación *se dio por primera* vez en reconsideración, accediendo el Tribunal a su solicitud. *Green v. Biddle*, 21 U.S. 1 (1823). Véase Krislov, *supra*. Esta práctica es aceptada en los tribunales federales. Véanse: *United States v. Brawner*, 471 F.2d 969, 973 (D.C. Cir. 1972); *In re Carter*, 192 F.2d 15, 25 (D.C. Cir. 1951); *Kephart v. Kephart*, 193 F.2d 677, 683 (D.C. Cir. 1951); *Reynolds Metals Company v. Lampert*, 324 F.2d 465 (9no

Cir. 1963); *Elgin, J. & E.R. Co. v. Burley*, 327 U.S. 661, 662 esc. 1 (1946). *Cf.* 15A *Wright, Miller and Cooper, Federal Practice and Procedure: Jurisdiction and Related Matters (Federal Question Jurisdiction—Diversity Jurisdiction)* Sec. 3902.1 (1992).

■    En consecuencia, resolvemos que tenemos jurisdicción para revisar nuestro dictamen anterior en virtud de la moción de reconsideración presentada por el amigo de la corte. Precisamente nuestra opinión original versó casi exclusivamente en torno a los planteamientos de derecho elaborados por el *amicus curiae*. De tales planteamientos doctrinarios es que se nos solicita la reconsideración. Por sus implicaciones para la profesión del notariado, reconsideramos.

## III

En *Zarelli v. Registrador*, supra, resolvimos que para que un *poder general* para contratar en nombre ajeno otorgado por la esposa a su marido, y mediante el cual éste compareció en representación de aquélla al acto de compraventa de un bien inmueble sito en Puerto Rico, fuera válido bajo las disposiciones de nuestro Código Civil, tenía que constar de forma escrita(¹) y estar redactado en térmi-

---

(¹) En el caso de bienes gananciales *el requerimiento de que el poder conste por escrito surge por mandato expreso del Art. 1313 del Código Civil*, 31 L.P.R.A. sec. 3672, el cual dispone a los efectos:

"No obstante lo dispuesto en la sec. 284 de este título, ninguno de los dos podrá donar, enajenar, ni obligar a título oneroso, los bienes muebles e inmuebles de la sociedad de gananciales, *sin el consentimiento escrito* del otro cónyuge, excepto las cosas destinadas al uso de la familia o personales de acuerdo con la posición social o económica de ambos cónyuges." (Énfasis suplido.)

Si bien en *Zarelli v. Registrador*, 124 D.P.R. 543 (1989), señalamos que en los demás casos no se requiere que la expresión específica sea por escrito (*In re Feliciano Ruiz*, 117 D.P.R. 269, 277 (1986)), hacemos constancia de las disposiciones del Art. 1232(5) del Código Civil, 31 L.P.R.A. sec. 3453. Véanse: *Sucs. de Andreu & Co. v. Reg. de la Prop.*, 20 D.P.R. 421 (1914); *Ray v. Registrador de la Propiedad*, 12 D.P.R. 283 (1907); *Díaz Caneja v. Marxuach*, 8 D.P.R. 480 (1905).

nos expresos($^2$) en cuanto a los negocios o actos jurídicos autorizados.

Además, una mayoría de este Tribunal expresó que aunque no es necesario hacer una descripción registral de la propiedad ganancial, es *indispensable* que el poder mencione que el inmueble objeto del contrato está localizado en Puerto Rico. Posteriormente, en la opinión emitida en *Gorbea Vallés v. Registrador,* supra (objeto de esta reconsideración), este Foro resolvió que la mención en *el poder* de que el inmueble está sito en Puerto Rico constituía un elemento consustancial del requerimiento de mandato expreso o específico, a tono con las disposiciones de bienes inmuebles gananciales contenidas en nuestro Código Civil, constituyendo dicho requisito uno de fácil incorporación en tales instrumentos y que no impedía el libre tráfico de los negocios jurídicos por vía de poderes.

Un examen integral de las disposiciones del Código Civil respecto al instrumento de los poderes y la institución de la representación (es decir, la contratación en nombre ajeno) en consideración a las actuales tendencias en el ámbito del derecho notarial en relación al derecho internacional privado, dada la realidad de la globalización de la economía mundial y la consiguiente compenetración de los mercados a nivel internacional, de la cual Puerto Rico no

---

($^2$) Las disposiciones pertinentes del Código Civil disponen de la manera siguiente:

"*Sec. 3672. Consentimiento de la esposa*

"Sin embargo de las facultades que tiene el marido como administrador, no podrá donar, enajenar y obligar a título oneroso, los bienes inmuebles de la sociedad de gananciales, sin el consentimiento expreso de la mujer.

"Toda enajenación o convenio que sobre dichos bienes haga el marido en contravención a esta sección, y las demás dispuestas en este título o en fraude la mujer, será nulo y no perjudicará a ésta ni a sus herederos." 31 L.P.R.A. sec. 3672 (ed. 1955).

"*Sec. 4425. Mandato concebido en términos generales; mandato expreso; facultad de transigir*

"El mandato concebido en términos generales, no comprende más que los actos de administración.

"Para transigir, enajenar, hipotecar o ejecutar cualquier otro acto de riguroso dominio, se necesita mandato expreso.

"La facultad de transigir no autoriza para comprometer en árbitros o amigables componedores." 31 L.P.R.A. sec. 4425 (ed. 1955).

está ajeno, exige nuestra reconsideración de tal requerimiento.

Debemos recordar que la nuestra es una economía abierta en la que son miles las transacciones que se realizan entre personas y entidades de todos los países del mundo y entre millones de compatriotas que viven en EE. UU. Muchas de las transacciones se realizan con personas y entidades de países cuyas disposiciones sobre el mandato *son análogas a las nuestras por ser de estirpe civilista, ninguna de las cuales requiere que el poder especifique la localización del inmueble en sus jurisdicciones particulares.* Entre estos, entidades en México y la provincia canadiense de Quebec incrementarán su tráfico comercial con Puerto Rico como producto del reciente tratado de libre comercio entre tales Naciones y Estados Unidos.

El poder, instrumento de la representación, cobra vigencia en innumerables transacciones contractuales realizadas diariamente. Su regulación por el Código Civil responde al interés social de hacer viable el hecho de la contratación en nombre ajeno y de brindarle seguridad y uniformidad a los negocios y obligaciones nacidas de ese modo. Como bien señala Díez-Picazo, "[e]n el punto de partida de la teoría de la representación no hay probablemente nada más que esto: un problema práctico, que consiste, sucintamente, en hacer posible una cooperación o una colaboración entre los miembros de una misma comunidad jurídica impulsada por razones de necesidad o de pura conveniencia". L. Díez-Picazo y Ponce de León, *El concepto jurídico de la representación en el derecho privado*, XVI Anales de la Academia Matritense del Notariado 135, 136 (1968).

A tales efectos, en cuanto a los requisitos de forma y contenido, no debemos exigir en el instrumento condiciones más onerosas o formalidades mayores que las especificadas en el Código Civil para garantizar la seguridad de las transacciones y del tráfico jurídico. El rigor que exige el

velar por el cumplimiento estricto con los requisitos subs-
tantivos de ley ha de realizarse sin "olvida[r] que el dere-
cho es una realidad nacida para facilitar las relaciones hu-
manas y no para dificultarlàs o hacerlas más complicadas".
E. Giménez-Arnau, *Derecho Notarial*, 2da ed., Pamplona,
Eds. Univ. Navarra, 1976, pág. 550.

No es función de este Foro legislar para enmendar el
Código Civil de Puerto Rico, imponiendo requisitos adicio-
nales a los poderes no considerados en el Código. El ha-
cerlo trastoca una pieza jurídica como lo es el Código Civil,
cuyas disposiciones y figuras jurídicas están diseñadas y
articuladas para que provean un ordenamiento lógico, fun-
cional e integral de lo que regula.

■  Ciertamente, la seguridad del tráfico jurídico
exige que los términos de un mandato expreso —aquel que
revela la intención del mandante de que se realice un acto
de disposición específica— sean interpretados de modo res-
trictivo para asegurar que el poder habiente actúa dentro
del mandato que se le otorga. *Zarelli v. Registrador*, supra,
pág. 554; *Banco de San Juan v. Registrador*, 103 D.P.R.
417, 422 (1975). Se trata de un requisito en función de
salvaguardar la verdadera intención del poderante au-
sente, no dando margen "para proposiciones y reflexiones
que puedan conducir a la extralimitación del apoderado y
adulteración del mandato". *Banco de San Juan v. Registra-
dor*, supra, pág. 422. Véanse: 31 L.P.R.A. sec. 4425; *Ma-
dera v. Metropolitan Const. Corp.*, 95 D .P.R. 637, 648
(1967). " '[L]a ley, que debe velar por los intereses de todos,
no puede consentir que un hombre se exprese vaga y gene-
ralmente sobre el derecho que confiere a otro para enaje-
nar o hipotecar [(o realizar otros actos de riguroso dominio,
añadiríamos)] con lo que podría fácilmente despojarle de
cuanto posee y consumar su ruina; un poder tan exhorbi-
tante debe hallarse escrito en los términos más formales y
explícitos: cuando no se hizo así, la ley, conforme con la
razón, presume que el mandante no quiso conferirlo.' " J.M.

Manresa y Navarro, *Comentarios al Código Civil Español*, Madrid, Ed. Reus, 1972, T. XI, pág. 637.

██ Del propio texto del Art. 1604 del Código Civil, *supra*, surge que tal requisito de *especificidad (mandato expreso)*, no obstante, se circunscribe a los *actos* de riguroso dominio (*"vis-à-vis" actos* de administración), es decir, la especificación requerida se refiere *a la mención de los actos o negocios jurídicos permitidos y no a requisitos en torno a la descripción de los bienes objeto del contrato o a la localización de éstos.*

Al respecto, fundamentado en las resoluciones de la Dirección de Registros de España, Manresa señala que "[l]a cancelación de una hipoteca sólo puede obtenerse con mandato expreso .... Estas cancelaciones, lo mismo que las ventas, serán inscribibles, aun cuando en el mandato *no se designen concretamente los bienes objeto de la venta ...".* Manresa y Navarro, *op. cit.*, pág. 638.

De forma similar reseña la Resolución de 5 de agosto de 1907 que señala que en el poder para donar no es necesario que se describan las fincas que han de donarse.

██ El hacer designación particular de algunos bienes, ya sea mediante una referencia registral específica, indicando su procedencia (refiriéndonos a que están sitos en tal o cual jurisdicción o cualquier otra forma de particularización o identificación) queda al libre arbitrio del poderante, *más no es elemento que afecte el carácter expreso del mandato general.* Tal conclusión se refuerza si consideramos que nuestro ordenamiento dispone que se pueden otorgar poderes *sobre propiedades futuras, autorizando el acto* sin especificar el bien, pues al momento de su otorgamiento se desconoce. Véase *South Porto Rico Sugar Co. v. Registrador*, 46 D.P.R. 300, 301–302 (1934); *Bolívar et al. v. El Reg. de la Propiedad*, 13 D.P.R. 375 (1907); *Vidal v. El Registrador de la Propiedad*, 12 D.P.R. 167 (1907). También si consideramos la importancia del *poder general* en el

ámbito de contratación de las sociedades civiles. 31 L.P.R.A. secs. 4354, 4357 y 4371.

Examinado cuidadosamente nuestro ordenamiento jurídico, no encontramos que el requerir mención sobre la localización del inmueble en Puerto Rico brinde garantías adicionales.

Su mención o no, no afectará el que se aplique la ley de Puerto Rico al acto jurídico que involucre el bien sito aquí, en virtud de las disposiciones del Art. 10 del Código Civil, 31 L .P.R.A. sec. 10, el cual establece que los bienes inmuebles están sujetos a la ley de la nación donde están sitos. Su mantenimiento, sin embargo, puede afectar el tráfico jurídico entre Puerto Rico y otros países, donde la profesión legal, al indagar sobre la ley vigente en Puerto Rico, habrá de recurrir como fuente primaria a la letra del Código Civil, luego a nuestra jurisprudencia interpretativa de la misma, y a los persuasivos comentarios que hacen los tratadistas reconocidos del mundo civilista sobre disposiciones análogas, cuyas obras son de amplia disponibilidad, ninguno de los cuales conocemos aduzca al hecho de señalar que el inmueble radica en determinada jurisdicción como elemento consustancial del requisito de ser expreso en un mandato general. Véase Oficina Notarial Permanente de Intercambio Internacional, *Régimen de los Poderes de los Países Americanos*, Unión Internacional del Notariado Latino, Argentina, 1986.

Como atinadamente apunta el Informe de la Comisión de la Integración Económica del Cono Sur del Consejo Federal del Notariado Argentino: "Una ley fundamental que rige los procesos de integración es la ley de la homogeneidad; cuando no se da la homogeneidad los procesos de integración levantan formidables barreras, que traban, impiden y tornan imposible la consecución de objetivos de formación de un único espacio común en [ma]teria económica y jurídico-notarial ...". J. Guglietti, *Informe de la Co-*

*misión de la Integración Económica del Cono Sur del Consejo Federal del Notariado Argentino*, 87 Rev. Internacional del Notariado 447 (1991).

La tendencia contemporánea, producto de los crecientes procesos de globalización económica e integración de mercados, ha requerido el ajustar las normas jurídicas del mandato para *lograr una mayor uniformidad jurídica que haga viable y facilite el tráfico económico internacional.* Oficina Notarial Permanente de Intercambio Internacional, *op. cit.* "También puede decirse que existe un Derecho Internacional Privado Unificado en materia asimismo de forma de los poderes en la Convención Interamericana sobre régimen legal de los poderes para ser utilizados en el extranjero, celebrada en Panamá en 1975." M. Szeimblum, *Valor y efecto de un documento extranjero recibido por un notario*, ponencia ante el XX Congreso del Notariado Latino celebrado en Cartagena, Colombia, Asociación de Escribanos del Uruguay, 1992.

No podemos dar la espalda a las nuevas exigencias del mundo moderno en cuanto a la facilitación del tráfico comercial entre las naciones. Véase *Vda. de Ruiz v. Registrador*, 93 D.P.R. 914, 925 (1967).

En consecuencia, *revocamos nuestros pronunciamientos previos en cuanto a que la mención en un poder general de que el inmueble radica en Puerto Rico constituye un elemento consustancial al requisito de mandato expreso para la realización de actos domínicos por parte del mandatario.*

*Se dictará sentencia de conformidad.*

El Juez Asociado Señor Negrón García disintió mediante una opinión escrita, a la cual se unió el Juez Asociado Señor Hernández Denton.

– O –

Opinión disidente del Juez Asociado Señor Negrón García, a la cual se une el Juez Asociado Señor Hernández Denton.

No tenemos jurisdicción para acoger la reconsideración solicitada exclusivamente por el *amicus curiae*, Asociación de Notarios de Puerto Rico, Inc. (en adelante Asociación de Notarios), en torno a la opinión y sentencia emitida el 30 de junio de 1992.

Los recurrentes Gorbea *et al.* y el Registrador de la Propiedad, verdaderas partes con legitimación activa, no la pidieron dentro del término reglamentario de quince (15) días laborables. Ahí debió terminar este recurso.

No obstante, en una *acción sin precedente* la mayoría ha decidido reconsiderar —aunque para hacerlo tengan que ignorar términos fatales jurisdiccionales— desarticular la doctrina sobre legitimación activa firmemente establecida en el ámbito hipotecario, desnaturalizar la función del *amicus curiae* e incurrir en unas contradicciones graves entre sí. A esos efectos, la mayoría concluye que "[e]n cuanto a la capacidad del *amicus curiae* de solicitar una reconsideración, no encontramos fundamento alguno que lo impida o que restrinja nuestra discreción de acogerla". Opinión mayoritaria, pág. 314. Como este aserto es negativo, a continuación le brindamos a la mayoría algunos fundamentos *encontrados* que restringen y afectan nuestra discreción para acogerla.

I

Por todos es conocido que en la actual Ley Hipotecaria y del Registro de la Propiedad —Art. 76, según enmendado, 30 L.P.R.A. sec. 2279— subsiste la doctrina de que los notarios autorizantes de los documentos públicos, per se, "no

son partes interesadas que puedan solicitar la inscripción de los mismos y que carecen de personalidad para interponer un recurso gubernativo contra las calificaciones que hiciere el registrador respecto a los documentos ante ellos otorgados. *Más v. Registrador*, 16 D.P.R. 9 (1910) y *Roig v. Registrador*, 18 D.P.R. 11 (1912)". *Mena v. Registrador*, 80 D.P.R. 783 (1958).

El Art. 88.1 del reglamento hipotecario recoge este principio al expresamente disponer que "[e]l recurso gubernativo sólo podrá ser promovido por el interesado en la inscripción o sus legítimos representantes o mandatarios. *Los notarios que hubieren autorizado los instrumentos a los que se les haya señalado defecto no podrán recurrir en su propio nombre*". (Énfasis suplido.) Reglamento General para la Ejecución de la Ley Hipotecaria y del Registro de la Propiedad, 30 L.P.R.A. sec. 2003-88.1, edición especial.

Si bajo la Ley Hipotecaria y del Registro de la Propiedad y su Reglamento, un notario autorizante carece de legitimación activa para, a nombre propio, presentar un recurso gubernativo —y claro está, una reconsideración— ¿bajo qué principio jurídico puede autorizarse a la Asociación de Notarios? ¿Qué misteriosa lógica judicial explica semejante trato diferencial? En un juego de palabras la mayoría nos dice que "[e]n cuanto a la capacidad del *amicus curiae* de solicitar una reconsideración, no encontramos fundamento alguno que lo impida ...". Opinión mayoritaria, pág. 314. ¿Qué elementos valorativos nutren ese discernimiento? Ciertamente, el razonamiento no puede fundamentarse en el criterio del *número de notarios*. En conclusión, la Asociación de Notarios jamás podría comparecer como parte; a lo sumo, como *amicus curiae*. Y admitida en el presente recurso en esta última capacidad, la confusión mayoritaria es alarmante.

## II

De un lado exponen correctamente la doctrina de que la Asociación de Notarios, como *amicus*, no es "parte formal en el caso" ni puede "controlar el curso de la litigación" (opinión mayoritaria, pág. 314), para luego desconcertadamente concluir "[e]n cuanto a la capacidad del *amicus curiae* de solicitar una reconsideración, no encontramos fundamento alguno que la impida o restrinja nuestra discreción de acogerla". Íd., pág. 314. Sinceramente, si ninguna de las partes solicitó la reconsideración, permitirlo separadamente a la Asociación de Notarios, ¿no es precisamente dejarle asumir y "controlar el curso de la litigación"?

Ni aún en la jurisdicción federal, en que liberalmente se le ha reconocido un amplio papel al *amicus curiae*, han concedido derechos que sólo pertenecen a las partes, tales como apelar, *pedir reconsideración* o, en general, controlar los procedimientos.

> El *amicus*, sin embargo, *nunca* ha sido reconocido, elevado o se le ha concedido el status completo de litigante que posee una parte con interés, *Miller–Wohl Co.*, 694 F.2d., pág. 204; al *amicus* se le ha impedido consistentemente que inicie procedimientos legales, someta algunos alegatos o que de alguna otra manera participe de forma tal que asuma el control de la controversia de una manera totalmente adversativa ... históricamente ha existido una distinción tajante entre un *amicus curiae* y una verdadera parte interesada en un caso o controversia. *U.S. v. State of Mich.*, 940 F.2d 143, 165 (6to Cir. 1991). (Énfasis y traducción nuestros.)

De hecho, ese enfoque ha sido constante en su evolución. "El *amicus* no es parte en la litigación." M.K. Lowman, *The Litigating Amicus Curiae: When Does the Party Begin After the Friends Leave?*, 41 (Núm. 4) Am. U. L. Rev. 1243, 1256 esc. 81 (1992). No empece, ocasionalmente algunos tribunales confrontan dificultades para distinguirlos. Los comentaristas lo atribuyen básicamente a los amplios poderes concedidos en el caso original en que se utilizó. Íd.,

págs. 1254–1256. "Es irónico que en la primera aparición del *amicus curiae* en la corte federal, el Tribunal Supremo le permitió ejercer mayores poderes que los que usualmente se permitirían hoy ... el papel del *amicus* en el caso de *Green* no era similar al mecanismo de *amicus* en el derecho común, en cambio, este mecanismo de *amicus* se asemejaba más al concepto moderno de *parte interventora.*" (Traducción y énfasis nuestros y escolios omitidos.) Íd., págs. 1254–1255.

Lamentablemente, la opinión mayoritaria adolece de esa misma turbación al enfatizar y descansar en el primer caso ante el Tribunal Supremo federal (opinión mayoritaria, pág. 313), aun cuando el artículo que citan en apoyo de este precedente histórico[1] —S. Kislov, *The Amicus Curiae Brief: From Friendship to Advocacy*, 72 (Núm. 4) Yale L.J. 694, 700–701 (1963)— advierte:

Confrontado con este comportamiento particular por parte de uno de los participantes nominales, *que sugerían claramente la existencia de una confabulación entre las partes,* el Tribunal permitió este *extraordinario procedimiento* y una solicitud de reconsideración del *amicus curiae. Debido a que el amicus curiae no se le considera una parte, la mayoría de las jurisdicciones hoy en día no le permitirían iniciar una moción procesal tan importante. ...* Nuevamente, en vista de la actitud usual de que "el *amicus curiae* no puede realizar actos a nombre de una parte", "que no actúa a nombre de nadie" y que "el tribunal bajo sugerencia del *amicus curiae* sólo puede hacer lo que haría sin tal sugerencia", *este debut del amicus curiae en el Tribunal Supremo debe ser reconocido como uno dramático e inusual.* (Traducción y énfasis nuestros y escolio omitido.)[2]

---

[1] En el esc. 37 se sugiere que se compare dicho caso con *Campbell v. Swasey*, 12 Ind. 70 (1859).

En los casos citados por la mayoría —*United States v. Brawner*, 471 F.2d 969 (D.C. Cir. 1972); *Kephart v. Kephart*, 193 F.2d 677 (D.C. Cir. 1951); *Reynolds Metals Company v. Lampert*, 324 F.2d 465 (9no Cir. 1963), y *Elgin, J. & E.R. Co. v. Burley*, 327 U.S. 661 (1946) —el *amicus* no controló los procedimientos. Por excepción, en *In re Carter*, 192 F.2d 15 (D.C. Cir. 1951), el *amicus*, quien además de esa condición había sido *parte* en procedimientos anteriores, pudo presentar una moción al tribunal.

[2] Muchos tribunales y tratadistas han advertido los peligros que encierra dar el control procesal de un litigio a quien no es parte formal. En este sentido, la Corte

En atención a los derechos básicos de las verdaderas partes en este recurso gubernativo, en aras de salvaguardar la integridad del proceso judicial puertorriqueño, debimos mantener el valioso mecanismo de *amicus curiae* como uno orientador y representante de alguna posición, *sin jamás* concedérsele la potestad de controlar el litigio. "[E]l *amicus curiae* no tiene la categoría de parte, no puede, como tal, ejercer *ningún control* sobre el curso de la litigación, y no está limitado ni es beneficiado por los efectos concluyentes de la sentencia." (Traducción nuestra.)(³) 1B *Moore's Federal Practice* Sec. 0.411[6], pág. 247 (1993).

En Puerto Rico esa era la doctrina hasta hoy. Nuestra jurisprudencia, aunque poca, había sido clara y consistente. Así, en *Pueblo ex rel. L.V.C.*, 110 D.P.R. 114, 127 (1980), dijimos que el *amicus curiae "en ningún momento se le ha considerado parte formal en el caso, y no puede controlar el curso de la litigación".* (Énfasis suplido.) Expresamos, además, que *"tampoco debe darse interven-*

---

de Apelaciones para el Sexto Circuito señaló:

"La creación de este mutante jurídico caracterizado como el 'amicus curiae litigante', según demostrado por la acriminiosa cascada de participantes en este litigio, si se le concede viabilidad de precedente, implicará y causará erosión en el centro de estabilidad de la jurisprudencia adversativa norteamericana, según la conocemos hoy en día." (Traducción nuestra.) *U.S. v. State of Mich.*, 940 F.2d 143, 164.

Más adelante añade el tribunal que "[s]ería extender carta blanca en la discreción a un juez para que convierta la corte en un foro libre para los grupos representativos de intereses especiales en conflicto capaces de frustrar y socavar la habilidad de las verdaderas partes en el litigio de obtener la pronta resolución de sus propias disputas; y son capaces, además, de complicar la habilidad del tribunal de efectuar su función judicial". (Traducción nuestra.) *U.S. v. State of Mich.*, supra, pág. 166.

(³) La jurisprudencia federal es abundante. En *Moten v. Bricklayers, Masons and Plasterers, etc.*, 543 F.2d 224, 227 (D.C. Cir. 1976), se dijo:

"Este Tribunal anunció una norma clara y simple en *United States v. Seigel*, 83 U.S. App. D.C. 88, 168 F.2d 143, 144 (1948): 'Desde hace mucho tiempo se ha establecido que el que no sea parte de récord y juicio no tiene derecho a apelar del fallo.' Esta norma tiene una larga historia de aceptación, *Heilman v. Ginberg*, 109 U.S. App. D.C. 105, 106, 284 F.2d 239, 240 (1960); *United States v. McFaddin Express, Inc.*, 310 F.2d 799, 801 (2do Cir. 1962); *First Iowa Hydro Electric Coop. v. Iowa-Illinois Gas & Electric Co.*, 245 F.2d 630, 631 (8vo Cir. 1957) .... Como el *amicus curiae* no puede apelar de un fallo final, la apelación de los Masones debe ser desestimada por falta de jurisdicción." (Traducción nuestra.)

Y en *New England, Etc. v. University of Colorado*, 592 F.2d 1196, 1198 esc. 3, el Primer Cicuito expresó:

ción al amicus curiae para que se convierta en una parte en el litigio.. El amigo de la corte puede ser el amigo de una causa, pero ante todo debe ser el amigo y servidor de la causa de la justicia". (Énfasis suplido.) Íd., pág. 129. Posteriormente, en *Pueblo v. González Malavé*, 116 D.P.R. 578, 580 (1985), resolvimos que " 'no debe darse la intervención para que se convierta en una parte del litigio' ".

## III

En lo sustantivo, no vemos razón alguna para variar la norma de *Zarelli v. Registrador*, 124 D.P.R. 543 (1989). Según aclarada en el de autos, *Zarelli v. Registrador*, supra, exige la mención en *todo Poder* —general o específico— que el inmueble *ganancial.* está sito en Puerto Rico. Reafirmamos que dicha norma constituye un elemento consustancial de la definición de "mandato expreso", conforme los preceptos sobre bienes inmuebles gananciales contenidas en la visión peculiar que gobierna su disposición en nuestro Código Civil. Además, no representa una carga onerosa

---

"Al conceder permiso habíamos asumido erróneamente, según se comprobó, que el abogado sabía lo que era un amicus, es decir, alguien que 'no es una parte, ... sino igual a cualquier extraño', *Martin v. Tapley*, 1875, 119 Mass. 116, 120, 'para asistir al tribunal, dar información en algunas áreas de derecho en las que el tribunal pueda tener dudas o estar errado', 1 Bouvier's Law Dictionary 188 (3d ed. 1914), en vez de ser alguien que da una versión esencialmente de una parte ('elocuente' según los demandados) de cuáles son los hechos."

Siguiendo estos mismos principios, en *U.S. v. State of La.*, 718 F. Supp. 525, 528 (E.D. La. 1989), el tribunal hizo "la observación de que, *como amicus curiae, Grambling carece de legitimación para conducir independientemente cualquier solicitud de reconsideración o apelación*". (Traducción y énfasis nuestros.)

A manera de ejemplos, véanse, además: *City and County of Denver v. Denver Tramway Corporation*, 23 F.2d 287, 295 (8vo Cir. 1927); *City of New Orleans v. Liberty Shop*, 101 So. 798, 799 (La. 1924); *Board of Com'rs. v. Baker*, 48 So. 654, 656 (La. 1909); *Clark v. Sandusky*, 205 F.2d 915, 917 (7mo Cir. 1953); *U.S. v. Smith*, 686 F. Supp. 847, 853 esc. 9 (D. Colo. 1988); *Muñoz v. County of Imperial*, 667 F.2d 811 (9no Cir. 1982); *State ex rel. Baxley v. Johnson*, 293 Ala. 69, 30 So. 2d 106, 111 (1974); *City of Winter Haven, Fla. v. Gillespie*, 84 F.2d 285 (5to Cir.), *cert.* denegado 299 U.S. 606 (1936); *National Com'n. on Egg Nutrition v. F.T.C.*, 570 F.2d 157, 160 esc. 3 (7mo Cir. 1977), *cert.* denegado 439 U.S. 821 (1978); *TRW, Inc. v. Ellipse Corp.*, 495 F.2d 314, 318 (7mo Cir. 1974).

al ejercicio del notariado ni impide el libre tráfico de los negocios jurídicos.

Carecen de valor persuasivo las consideraciones básicas esgrimidas por la mayoría para modificar. Intiman que "[m]uchas de las transacciones se realizan con personas y entidades de países cuyas disposiciones sobre el mandato son análogas a las nuestras por ser de estirpe civilista ...". (Énfasis suprimido.) Opinión mayoritaria, pág. 317. Más adelante concluyen que los notarios de estos países, al indagar sobre el derecho vigente en Puerto Rico, habrán "de recurrir como fuente primaria a la letra del Código Civil, *luego a nuestra jurisprudencia interpretativa* de la misma, y a los persuasivos comentarios que hacen los tratadistas reconocidos del mundo civilista sobre disposiciones análogas, cuyas obras son de amplia disponibilidad, ninguno de los cuales conocemos aduzca al hecho de señalar que el inmueble radica en determinada jurisdicción como elemento consustancial del requisito de ser expreso en un mandato general". (Énfasis suplido.) Íd., pág. 320.

Resulta *absurdo* pensar que estos profesionales del derecho al consultar la letra de nuestro Código, nuestros tratadistas y nuestra "jurisprudencia interpretativa", ignoren *Zarelli v. Registrador*, supra, esto es, el caso específico que resuelve la cuestión que están ellos investigando. Si en algo hemos adelantado en los últimos años es en el área de la informática jurídica. En la actualidad existen numerosos sistemas cuyas fuentes y recursos técnicos facilitan el conocer rápidamente y con precisión las normas de derecho civil y notarial vigentes de otros países y su jurisprudencia interpretativa. Textos legales, códigos y leyes anotadas, colecciones especializadas almacenadas en computadoras, están tan distantes como la mano del simple teclado. Si aplicamos el razonamiento mayoritario a la propia opinión que hoy emite el Tribunal, ¿cómo se van a enterar los notarios extranjeros? Contrario a la preocupación de la mayoría, el profesional legal extranjero encontrará resuelto el

punto de derecho del citado caso *Zarelli v. Registrador* —cualquiera que sea— sin dificultad alguna.

Sobre la situación descrita por la mayoría, ¿no sucedería si mañana la Asamblea Legislativa incorporara al Código Civil la norma de *Zarelli v. Registrador*, supra? ¿No ocurre igual con otros preceptos que hayamos interpretado de forma diferente? ¿Qué de aquellos artículos distintos que existen en el Código Civil? ¿Sugiere la mayoría que en materia civilista o notarial nuestro ordenamiento civil tiene que ajustarse y seguir indefectiblemente las normas de otros países? Repetimos, que ello sea un enfoque distinto al de otras jurisdicciones, ¿qué tiene que ver? El argumento es peregrino; a la postre, en nada afecta la validez inherente de la norma.

Aparte de lo expuesto, el análisis sobre posibles complicaciones que podrían confrontar los notarios en países civilistas otra vez descarta la realidad no contradicha de que Puerto Rico no es signatario ni ha ratificado la *Convención Interamericana sobre Régimen Legal de los Poderes* a ser utilizados en el extranjero, suscrita en Panamá en 1975. También desatiende el fenómeno de que debido a la situación peculiar política que regula nuestras relaciones con Estados Unidos, el grueso de los poderes de este tipo son otorgados por cientos de miles de puertorriqueños o sus descendientes residentes en *Estados Unidos*.

Allá los notarios *no* son abogados ni profesionales del derecho, sino más bien simples delegados del Tribunal. M.L. Closen y G. Grant Dixon, *Notaries Public from the Time of the Roman Empire to the United States Today, and Tomorrow*, 68 (Núm. 4) N.D. L. Rev. 873, 877–878 (1992). En esencia, se limitan a dar fe en el documento de la persona, el lugar y la fecha, sin evaluar la sustancia de su contenido. Excepto en el estado de Lousiana, el notario anglosajón carece de conocimientos jurídicos, no da fe de la capacidad de las partes, no redacta el documento, no tiene un Protocolo y no archiva el documento original, sino que

sólo lo anota en un libro índice. W. Miranda Marcelo, *El sistema de transmisión y constitución de derechos reales en el sistema anglosajón*, Ponencia VIII, Encuentro Internacional del Notariado Norteamericano, octubre de 1974. Esta situación ha sido gráficamente descrita por Domingo Toledo Álamo aludiendo el "caso de un bodeguero puertorriqueño que era, a la vez, notario, y alternaba el despacho de los comestibles con la legalización de los documentos. Y, en los bufetes de abogados, firmas profesionales en que aparecen múltiples apellidos, hay siempre dos o tres de las elegantes y atractivas secretarias que son notarios al mismo tiempo". D. Toledo Álamo, *La función notarial y la instrumentación de los derechos reales sobre bienes muebles*, Ponencias y Comunicaciones presentadas al III Congreso Internacional de Derecho Registral, San Juan, Inst. Der. Not. Reg., 1977, T. II, pág. 523.

¿Vamos a equiparar ambas funciones? No podemos olvidar que los poderes representan el elemento fundamental de *consentimiento* de cuya validez depende todo negocio jurídico. Con frecuencia las negociaciones y contratos generan litigios. La precisión es un imperativo en este tipo de documento. *Ello explica la práctica usual consistente en que el poder lo prepara un abogado-notario en Puerto Rico y lo remite a Estados Unidos para la autenticación de las firmas.*

Esta práctica justifica por sí sola la norma pautada en *Zarelli v. Registrador*, supra, pág. 556, a saber, "[a]unque no es necesario hacer una descripción registral de la propiedad ganancial, es indispensable que el poder mencione que el inmueble estaba localizado en Puerto Rico y qué tipo de negocio se puede realizar". A propósito, no alcanzamos a comprender la objeción mayoritaria fundamentada en que muchas jurisdicciones no requieren una descripción registral detallada del inmueble en el mandato expreso. Según transcrito, *no* hemos exigido tal descripción, sólo la mención de que el inmueble ganancial está sito en Puerto Rico.

## IV

Coincidimos con la mayoría que "[n]o es función de este Foro legislar para enmendar el Código Civil de Puerto Rico ...". Opinión mayoritaria, pág. 318. Sin embargo, nunca debemos confundir "legislación" con la legítima función judicial de "interpretación", en particular aquella receptora de las pulsaciones del medio social a tono con las necesidades y las tendencias de cada momento histórico. En la búsqueda de una uniformidad notarial internacional rehusamos cegarnos con el brillo de lo foráneo y claudicar a forjar normas jurídicas propias, que responden a unos imperativos de conciencia judicial resultante de factores políticos, sociales y económicos muy distintos al de los países latinoamericanos.

El Art. 1604 del Código Civil, 31 L.P.R.A. sec. 4425, requiere un *mandato expreso* "[p]ara transigir, enajenar, hipotecar o ejecutar cualquier otro acto de riguroso dominio". (Énfasis suplido.) Y·el Art. 1313 exige consentimiento escrito de los cónyuges para enajenar sus bienes inmuebles gananciales. 31 L.P.R.A. sec. 3672. El vocablo *expreso* significa *claro, patente, específico. Diccionario de la Lengua Española*, Madrid, Ed. Espasa-Calpe, 1970. Rechazamos adherirnos injustificadamente al rigor gramatical. Al decir de Puig Brutau, ha sido "indispensable sustituir las concisas columnas del diccionario por las explicaciones que correspondan a una más honda y exacta penetración·del sentido de cada equivalencia de vocablos". J. Puig Brutau, *Estudios de derecho comparado: la doctrina de los actos propios*, Barcelona, Ed. Ariel, 1951.

Según indicado, si de algo peca la norma adoptada originalmente en *Zarelli v. Registrador*, supra, es añadir certeza a este tipo de negocio jurídico al hacerlo más específico. Ello, no obstante, no es razón válida para descartarla.

En resumen, donde ninguna de las verdaderas partes, en término, pidieron reconsideración, y aun cuando no hay jurisdicción, el Tribunal la confiere a base de una reconsideración de un *amicus curiae* sin legitimación activa. Así, la mayoría oblitera principios básicos en materia procesal e hipotecaria.

La norma de *Zarelli v. Registrador*, supra, no erige barreras al comercio internacional. Aplicando criterios prácticos de utilidad y eficacia, tampoco impone un requisito oneroso; en contrario, su confección sencilla logra la certeza jurídica y especificidad que creemos un mandato de este género debe tener en atención al carácter ganancial del bien inmueble y su importancia al régimen económicomatrimonial puertorriqueño.

Nos da la impresión de que al refrendar los argumentos del *amicus* Asociación de Notarios, ésta ha logrado que el Tribunal Supremo, sin tener la más mínima prerrogativa, haya firmado el tratado sobre Poderes adoptado en Panamá en 1975. ¿INTERPRETACIÓN O LEGISLACIÓN?